Galen SCHRAG, et al., Plaintiffs,

v.

Ted DINGES, Jr., et al., Defendants.

Civ. A. No. 88–1373–FGT.

United States District Court,
D. Kansas.

Aug. 13, 1993.

Michael E. Baker, McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, KS and James C. Dodd, Craig Dodd & Associates, Enid, OK, for plaintiffs.

Thomas D. Kitch, David G. Seely, Fleeson, Gooing, Coulson & Kitch, David J. Morgan, Robert J. Roth, Hershberger, Patterson, Jones & Roth, Wichita, KS, Thomas L. Theis, Derenda J. Mitchell, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, William L. Mitchell, Mitchell & Henry, Hutchinson, KS, Albert L. Kamas, Render, Kamas & Hammond, and Joseph H. Cassell, Wichita, KS, for defendants.

### MEMORANDUM AND ORDER

THEIS, District Judge.

This is a civil action brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. The matter is before the court on motions for summary judgment by defendant Mark Youngers (Doc. 679) and defendant Fred Shaffer (Doc. 774). Also before the court is a motion for sanctions by defendants Denis Dieker and Bonaventure Kreutzer. (Doc. 793).

The plaintiffs allege that the defendants were involved in four separate fraudulent schemes involving development of a real estate investment firm called Rexmoor Properties, Inc. ("Rexmoor"). Only the schemes alleged in Counts II and III are involved in the summary judgment motions now before the court. The court has already disposed of Counts I and V, and Count IV involves only defendants who have not moved for summary judgment. However, those Counts are relevant to determining the various defendants' knowledge, intent and participation, and to establishing a pattern of racketeering.

Defendants Youngers and Shaffer were officers and/or directors of financial institutions which participated in the financing of Rexmoor. Defendant Youngers was also a director of Paganica, Inc. ("Paganica"), one of the real estate development firms involved. Plaintiffs allege that Shaffer and Youngers participated with Gary and Ted Dinges in the schemes to defraud plaintiffs.

### I. Plaintiffs' Allegations

The court will begin with a summary of the relevant allegations in the Third Amended Complaint. Count One involved the Paganica Supper Club scheme. Merlin Kaufman, the plaintiff in Count II, owned a section of land that he was developing into a large residential community, which included a country club and golf course. Defendant Gary Dinges, through his company called Paganica, was responsible for managing the development of streets, sewer and water and for marketing the residential lots in Kaufman's development. Kaufman and his partner, Herb Sizemore, owned all the property within the development except for the residential lots sold to individual purchasers and the golf course area, which belonged to Paganica.

Within the country club complex were a pro shop and supper club, both operated by plaintiffs Schwartz's and Meiers' corporation, S & M, Inc., under a lease agreement with Paganica. On April 1, 1981, Paganica entered into a contract allowing S & M to take over operations of the entire country club complex and granting S & M an option to purchase the complex and golf course for $1 million. S & M received an express promise that the property would not be further encumbered.

As the developer, Paganica possessed exclusive authority and responsibility for the development of the property. In 1980, the EPA halted the sale of lots and froze the development due to substandard well and sewer systems. Paganica was directed to repurchase all previously sold lots for the original price plus interest. Paganica installed new water and sewer systems through the issuance of municipal bonds, and hoped that the lots would find new purchasers. The lots, however, remained virtually unsold by 1982. The EPA repurchase requirement and

the lack of lot sales brought Paganica to the verge of bankruptcy.

Hoping to retire Paganica's debt and return the corporation to profitability, Gary Dinges and Ewing devised a plan to start a new corporation, refinance the Paganica debt, transfer Paganica's assets to the new corporation and retire the Paganica refinancing debt through the sale of stock issued by the new corporation, to be known as Rexmoor Properties, Inc. ("Rexmoor"). Under the alleged scheme, Rexmoor would hold and manage commercial real estate nationwide; property owners would own capital stock in Rexmoor in return for transferring their real estate to the corporation. The properties transferred to Rexmoor, however, had to be subject to low debt leverage or no debt at all, and had to have a positive cash flow after debt service.

Gary Dinges wished to participate as a principal in this new revolutionary business enterprise. He also wanted Paganica to exchange its property assets for stock in Rexmoor. However, Paganica and Gary Dinges were deeply in debt. He had no "debt free" property to exchange for Rexmoor stock and no capital to invest to get Rexmoor off the ground.

Defendant Mark Youngers was Chief Financial Officer at Valley Federal Savings & Loan. Youngers was a major stockholder in the nearly bankrupt Paganica. He also owned Stock in Americo, another insolvent company run by Gary Dinges. In November 1981, Gary Dinges agreed to trade Youngers' worthless stocks in Americo and Paganica for valuable capital stock in Rexmoor. In addition to this trade, Youngers, who stood to reap enormous profit from the success of Rexmoor, agreed to help Gary Dinges obtain loans from Valley Federal for the purpose of making Rexmoor a reality.

Gary Dinges, already deeply in debt from his Paganica ventures, approached Valley Federal in November 1981 for a loan to enable Rexmoor to make a public offering of its stock. When the Board of Directors of Valley Federal refused to grant the loan, one director of Valley Federal, defendant Shaffer—who personally stood to profit from the Rexmoor venture—entered into an agreement with Ellinwood Bank, whose president, defendant Simpson, also had a personal stake in Rexmoor. Under that agreement, Ellinwood Bank would loan Paganica $500,000 to be secured by a $500,000 irrevocable letter of credit issued by Valley Federal. As security for Valley Federal's letter of credit, Gary Dinges encumbered the property that was subject to the S & M exclusive option, in violation of their previous contract. Youngers, as a director and shareholder of Paganica and bank officer at Valley Federal, is alleged to have known about the S & M option to purchase the country club property. Plaintiffs also allege that Shaffer knew about the option. Because Paganica had to transfer "debt free" property to Rexmoor in exchange for stocks, Youngers, Shaffer and another Valley Federal officer, Charles Brooks, decided not to file the mortgage on the country club property. Simpson, in turn, agreed that Ellinwood Bank would not call Valley Federal's letter of credit if Valley Federal would loan $1 million on an uncreditworthy real estate project known as Hidden Valley, thereby releasing Simpson from a loan guarantee in connection with the Hidden Valley project. Because of the Hidden Valley loan, Simpson later permitted the Valley Federal letter of credit to expire.

Valley Federal—through Shaffer, Youngers and Brooks—made several major loans to Gary Dinges and Paganica in addition to arranging the letter of credit. To enable Paganica to qualify for loans of such magnitude, Dinges, Shaffer, Youngers and Brooks intentionally misrepresented Paganica's financial condition. Specifically, the income and assets of Paganica Golf and Supper Club, which belonged to S & M, were misrepresented as Paganica's assets and income.

These fraudulent loans extended by Valley Federal were repaid in May 1984 by Boulevard Bank. Youngers allegedly forwarded correspondence and loan documents, including the Paganica country club mortgage, to Denis Dieker, vice president at Boulevard Bank and defendant to Count V in this action, in an attempt to escape detection by the banking authorities.

Rexmoor never lived up to the expectations of its creators. By the middle of 1983, Shearson/American Express and Jessup & Lamont, respected national firms, withdrew as broker-manager for Rexmoor. In July 1983, Coldwell Bankers, the company that performed the appraisals on prospective Rexmoor properties, withdrew its approval to use its appraisals. In January 1984, the SEC refused to permit Rexmoor to go forward and conducted another review of the entire offering. The Rexmoor registration statement was withdrawn from the SEC on February 3, 1984.

The plaintiffs allege that the defendants committed mail fraud on various specified occasions in using the United States Postal Service to deliver correspondence, loan documents, mortgages, and other materials in connection with the fraudulent Paganica Supper Club scheme.

In Count II, the Kaufman Real Estate scheme, the plaintiffs allege that in September 1982 the defendants fraudulently mortgaged Kaufman's property, without his knowledge or consent, to The First National Bank and Trust Co. of Oklahoma City ("First National") as security for a $3.2 million loan commitment. On March 27, 1980, Kaufman and his partner, Sizemore, had entered into a contract to sell the development property to Paganica, Inc. The deed reflecting Paganica's purchase of the property was held in escrow at the Bank of Moundridge, which had held title to the property as trustee for Kaufman and Sizemore, and was to be turned over to Paganica upon full payment of the contract price. Paganica failed to make its regular payments on the contract. Someone affiliated with Paganica allegedly stole the deed and filed it with the Reno County Register of Deeds in March 1980. With title to the development property, Paganica was able to secure the First National loan, which was necessary to take Rexmoor public. The defendants Youngers, Brooks, Shaffer, Gary Dinges and Jay Ewing allegedly knew that the mortgaged property belonged to Kaufman, not Gary Dinges or Paganica. Although the mortgage was executed in September 1982, it was not recorded until February 1984.

In December 1982, Dinges convinced Kaufman to buy out Sizemore's interest in the development property. However, Dinges, not wanting Sizemore to know that Kaufman was the purchaser, insisted that the transaction take place with two deeds, one conveying Sizemore's interest to Paganica, and a second conveying the interest from Paganica to Kaufman. A third deed was executed extinguishing the trust arrangement with the Bank of Moundridge. Gary Dinges offered to record the deeds, but failed to record the deed that reflected the transfer of Sizemore's interest from Paganica to Kaufman.[1] With full knowledge of the fraudulent encumbrance on Kaufman's property, the defendants used the mail service to deliver the fraudulent mortgage, and to market two securities offerings containing misrepresentations as to Paganica's income and assets.

Count III alleges that, in November 1982, Ted Dinges, brother of Gary Dinges, convinced plaintiff Galen Schrag to invest in Ag-Marketing's Managed Partnership Accounts ("MPA"), a commodities trading scheme which Ted Dinges claimed to be a foolproof investment. Although Schrag did not have the money to invest, he was assured that Valley Federal would loan him the money. Schrag gave Valley Federal a security interest in his crops and milking equipment in exchange for a loan of approximately $356,-000. Schrag received $156,000 of the loan proceeds, which he invested in the MPA; the remainder went to Ag-Marketing, T. Dinges and Gary Dinges, as expected. The quarterly payments on the loan were in excess of $12,000. Ted Dinges and Brooks assured Schrag that Ag-Marketing would make all quarterly payments. However, Ag-Marketing failed to make the second quarterly payment or any payments thereafter. The MPA's were unsuccessful and Schrag lost his entire investment.

Defendant Youngers had invested in Ag-Marketing and thus had a stake in assuring

---

1. Plaintiffs apparently contend that Gary Dinges benefitted from and Kaufman was damaged by this alleged act of fraud even though it is alleged that Dinges had already wrongfully taken title to the entire development property in March 1980.

the financial integrity of Ag–Marketing. Shaffer and Brooks caused Valley Federal to make the Schrag loan, knowing that it would be used to sustain the effort to take Rexmoor public and to financially benefit those individuals instrumental to the success of Rexmoor. Youngers took no action to prevent the Schrag loan.

Ted Dinges also defrauded the McCurry brothers into investing $75,000 in Ag–Marketing, promising them that their investment would be protected by marketable securities in an escrow account. Motivated by his financial interest in Ag–Marketing and Rexmoor, Youngers allegedly misrepresented that Valley Federal would serve as an escrow agent for the above transaction, and signed a receipt acknowledging receipt of marketable securities for the escrow account. Youngers signed the receipt and mailed it to one of the McCurry brothers in December 1982. No such escrow account was ever created, however. Nor were any marketable securities delivered to Youngers. The plaintiffs subsequently lost their investments—after Ted Dinges had "churned" their accounts.

Plaintiff Maloney was another investor in Ag–Marketing's MPA's. He lost his entire $15,000 investment despite Ted Dinges' promise that the investment could not lose.

Briefly, Counts IV and V involve allegations of fraud perpetrated against the Nickelsons. In October 1985 the Nickelsons established a line of credit with Boulevard Bank, pledging their monthly checks from the sale of their business as security. Denis Dieker and Bonaventure Kreutzer, officers of Boulevard Bank, allegedly promised that one half of the disbursements under the line of credit would go to Gary Dinges, and the other half would go to the Nickelsons. Instead, the entire line of credit, $175,000, was disbursed to Gary Dinges. It was Gary Dinges who had encouraged the Nickelsons to borrow money from Boulevard Bank to in turn loan to him. Gary Dinges allegedly represented that he would use the money to pay closing costs for the sale of Paganica. Gary Dinges promised Nickelson total repayment plus a 20% profit from the proceeds of the sale. In fact, the Paganica sale had been closed eleven months earlier, after Rexmoor collapsed.

Gary Dinges instead used the money to repay his own debts at Boulevard Bank.

The plaintiffs allege that the defendants committed mail fraud on various specified occasions in using the United States Postal Service to deliver correspondence, loan documents, mortgages, and other materials in connection with the fraudulent schemes.

## II. Standards for Summary Judgment

The court is familiar with the standards governing the consideration of a motion for summary judgment. The Federal Rules of Civil Procedure provide that summary judgment is appropriate when the documentary evidence filed with the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The burden at the summary judgment stage is similar to the burden of proof at trial. The court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact on its claim(s). Rule 56, however, imposes no requirement on the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323, 106 S.Ct. at 2553 (emphasis in original). Once the moving party has properly supported its motion for summary judgment, the nonmoving party may not rest

upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial, relying upon the types of evidentiary materials contemplated by Rule 56. Fed.R.Civ.P. 56(e). Each party must demonstrate to the court the existence of contested facts on each claim it will have to prove at trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The court reviews the evidence on summary judgment under the substantive law and based on the evidentiary burden the party will face at trial on the particular claim.[2] *Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513.

### III. RICO Claims Against Defendants Youngers and Shaffer

This case is brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. 18 U.S.C. § 1964(c) provides that

> "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

Thus, in order to establish a civil cause of action a plaintiff must show a substantive RICO violation that proximately caused the plaintiff to be injured in his business property. *See Holmes v. Securities Investor Protection Corp.*, — U.S. —, — – —, 112 S.Ct. 1311, 1316–17, 117 L.Ed.2d 532 (1992) (proximate cause requirement).

In this case plaintiffs allege violations of § 1962(b) and (c), which state as follows:

> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain,. directly or indirectly, any interest in or control of any enterprise

which is engaged in, or the activities of which affect, interstate or foreign commerce.

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

A pattern of racketeering activity requires at least two predicate acts of racketeering. The acts must be "continuous" and "related." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3292, 3285, 87 L.Ed.2d 346 (1985). In this case, plaintiffs allege mail and wire fraud, which are predicate acts of racketeering. 18 U.S.C. § 1961(1)(B). For purposes of deciding these motions, the court will assume that the predicate acts alleged meet the pattern element of a RICO claim.

The Supreme Court has interpreted § 1962(c) to require proof that the defendant had a hand in controlling the conduct of the enterprise. *Reves v. Ernst & Young*, — U.S. —, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Subsection (b) provides for liability only for those who acquire or maintain an interest in an enterprise. In this case there is no dispute regarding the relationship between defendants Youngers and Shaffer and the relevant enterprises. Defendant Youngers clearly maintained an interest in Paganica and, as an officer of Valley Federal and a director of Paganica, participated in the conduct of both enterprises. Defendant Shaffer was a major stockholder and director of Valley Federal and thus maintained and interest in and participated in the conduct of Valley Federal.

The primary issue here is whether defendants Shaffer and Youngers maintained their

---

**2.** Plaintiffs' response brief indicates a lack of understanding of the standards for summary judgment. For example, plaintiffs' "Proposition IV" states that "Youngers completely fails to establish, as a matter of law, that he has not engaged in any racketeering activity, because he made no effort to establish that no racketeering activity occurred." Plaintiffs fail to apprehend that a defendant seeking summary judgment under Rule 56 need not "establish, as a matter of law" his nonliability. Rather, it is plaintiffs' burden to controvert defendants' facts or to otherwise establish a genuine issue of material fact. *See United States v. Dibble*, 429 F.2d 598, 601 (9th Cir.1970) ("A summary judgment is neither a method of avoiding the necessity for proving one's case nor a clever procedural gambit whereby a claimant can shift to his adversary his burden of proof on one or more issues.").

interests in and participated in the control of the relevant enterprises through a pattern of racketeering activity. Plaintiffs allege that defendants actually committed or directed some of the racketeering activity. Moreover, plaintiffs allege that the defendants, as co-schemers with the other codefendants, are liable for the racketeering activities of those codefendants. Plaintiffs indirectly allege a conspiracy to violate RICO's substantive provisions, which in itself is a violation under 18 U.S.C. § 1962(d).

Defendants Youngers and Shaffer present several arguments in support of their motions for summary judgment. Most importantly, they maintain that they did not, either by their own actions or by joining a conspiracy, engage in a pattern of racketeering activity. Upon consideration of the parties' arguments and the supporting evidence, the court agrees. The court will consider the evidence against each defendant separately.

## A. Youngers

In responding to the motion for summary judgment, plaintiffs allege a myriad of facts that they contend create a genuine issue as to Youngers' involvement in the alleged fraudulent schemes. However, all the facts plaintiffs allege against Youngers fall into one or both of two categories: those that have no support in the record; and those that are not evidence of a RICO violation.

The allegations against Youngers are as follows. As to Counts I and II, plaintiffs assert that Youngers assisted Paganica in receiving loans from Valley Federal, both in his capacity as an officer of Valley Federal and as a director of Paganica. Plaintiffs allege that Youngers benefitted from the Paganica loans because part of the proceeds thereof were used to finance Youngers' own investment in Rexmoor. It is also alleged that Youngers was responsible for the mailings related to Rexmoor stock and the various financial transactions. Plaintiffs allege that Youngers improperly took over Valley Federal's handling of the Paganica loans when Brooks resigned as president.

As to Count III, it is first alleged that Youngers did nothing to prevent Valley Federal from loaning money to Galen Schrag.

Next, plaintiffs allege that Youngers violated his duties as escrow agent for the McCurry brothers transaction. Youngers signed the escrow receipt although he allegedly knew the securities held in escrow were not marketable as represented by Ted Dinges and were not of sufficient value to cover the McCurry brothers' $75,000 investment.

Many of these allegations find no support in the record. First, plaintiffs assert that Youngers, as a director of Paganica, voted in favor of the loans from Valley Federal and First National. However, there is no evidence that supports this assertion. Both Youngers and Gary Dinges testified that Youngers was not involved in those borrowing decisions. Plaintiffs rely on speculation and a misrepresentation of deposition testimony to controvert this evidence. Moreover, plaintiffs did not even attempt to controvert Youngers' statement that he was not actively involved in Paganica after late 1981, when the loans to Paganica were actually made and the proceeds disbursed.

Second, there is no evidence that Youngers was involved in making the loans as an officer of Valley Federal. Youngers was not a director and was not in the loan department and therefore had no involvement in the approval of loans. At any rate, Youngers was not even employed by Valley Federal at the time Valley Federal decided to make the Paganica loans.

Third, there is no competent evidence for plaintiffs' assertion that a portion of the Paganica loans directly benefitted Youngers and Gary Dinges in some sort of payoff-kickback scheme. Rexmoor shareholders were required to commit to loaning Rexmoor $65,000 for every 40,000–share unit of stock. Although there is some dispute about the number of shares Youngers owned, there is no dispute that Gary Dinges made the loan to Rexmoor for Youngers. Youngers assigned to Gary Dinges the right to repayment from Rexmoor. Plaintiffs attempt to tie these facts to the Paganica loans by alleging that a portion of the Paganica loan proceeds were used to reimburse Gary Dinges, who also would receive repayment from Rexmoor. Plaintiffs' kickback allegations

are based entirely on conjecture, speculation and distortions of the record. Even if a kickback scheme existed, is inconceivable how Youngers, having assigned his right to repayment, could have received a payoff.[3]

The remainder of plaintiffs' allegations simply do not support a claim under RICO. First, Youngers concedes that he did not try to prevent the Schrag loan. However, there is neither any competent evidence that Youngers was aware of the loan before it was made,[4] nor any authority that the mere failure to prevent a financial transaction amounts to a RICO violation.

Second, Youngers admits that he, acting as Chief Financial Officer for Valley Federal, handled routine paperwork for the Paganica loans when Brooks resigned. The paperwork involved the repayment of the Paganica loans by Boulevard Bank. Plaintiffs assert that Youngers' involvement with these loans was highly improper, although Youngers was no longer actively involved in Paganica at the time. However, it is not necessary for the court to consider the propriety of Youngers' actions except as it relates to the RICO claim. Plaintiffs have failed to show that Youngers' conduct in conducting the routine paperwork transactions of the Paganica loans caused them any damage. More importantly, Youngers' handling of the loans once they were made is not evidence that he knew the loans were the result of any fraud against the plaintiffs.

Third, Youngers concedes that he received a copy of the Management Agreement that gave S & M, Inc., the option to purchase the country club property. This does not show that Youngers knew and approved of Dinges' intention to encumber the option property. Given that there is no evidence that Youngers approved the Paganica loans, Youngers'

notice of the option to purchase is not evidence of a RICO violation.

Fourth, as for the McCurry brothers transaction, plaintiffs allege that Youngers signed the escrow receipt for Rexmoor Stock Certificate no. 202 knowing that the Rexmoor stock was not a marketable security, and was not of sufficient value to cover the McCurry brothers $75,000 investment. The stock certificate represented 4,000 shares of Rexmoor stock with a one cent par value. However, the escrow agreement did not provide that Ag–Marketing would place into escrow $75,000 in securities. The securities were to cover losses between the investment amount and the stop loss amount of $50,000. Therefore, the agreement required Ag–Marketing to deposit $25,000 in marketable securities. Although plaintiffs argue that defendant Youngers knew the securities were not worth more than $16,000, the evidence does not support this argument. There were widely varying estimations of the value of Rexmoor stock, and 4,000 shares could have been worth as much as $100,000.

Plaintiffs also note that the certificate states on its face that it was not to be encumbered or transferred until a registration statement had been filed with the Secretary of State. However, plaintiffs make no showing that Youngers knew Rexmoor had not complied with this requirement when he signed the escrow receipt.

There is no doubt that the Rexmoor stock was not a marketable security. A marketable security is one that has a market and a known value. The Rexmoor stock fails both prongs of the test. The remaining questions, then, are (1) whether Youngers, as an escrow agent, was under the duty to verify Ted Dinges' compliance with the escrow agree-

---

3. The FII-loan-Dinges-kickback-Youngers-payoff scheme receives more extensive coverage in plaintiffs' brief opposing Shaffer's motion for summary judgment. Plaintiffs allege additional facts as evidence of the scheme. However, for the reasons discussed below in Section VI of this opinion, the court will not consider the additional factual allegations in deciding Youngers' motion for summary judgment.

4. Plaintiff does offer Youngers' sworn statement that he expressed concern about the Schrag loan

to several of his associates at Valley Federal. However, this statement is not competent evidence in support of plaintiff's position for several reasons: (1) There is some doubt as to its admissibility; (2) it unclear from the face of the statement whether the conversations took place before or after the loan was made; and (3) Youngers later corrected the statement to state that the conversations took place *after* Valley Federal had loaned Schrag the money.

ment, and (2) whether the failure to meet that duty amounts to a RICO violation. The answer to both questions is no.

■■■ The duties of an escrow agent are limited by the terms of the escrow. *Nickell v. Reser*, 143 Kan. 831, 835, 57 P.2d 101 (1936). As the Kansas Supreme Court has stated:

It is not within the province of a depository to interpret or construe the contract of the parties if its meaning is subject to question. The depository must be guided in the carrying out of its duty by what the contract says, for the agreement for escrow with its instructions constitutes the full measure of the duties and obligations assumed by the depository. The parties cannot expect more.

*Lewis v. Shawnee State Bank*, 226 Kan. 41, 46, 596 P.2d 116 (1979). In this case, the escrow agreement did not state any duties for the escrow agent except to hold the securities deposited by Ted Dinges. Mark Youngers signed the escrow receipt with the following statement: "This contract and above described Certificate No. 202 received and accepted by Valley Federal Savings and Loan Association of Hutchinson." Nothing in the escrow agreement imposed a duty upon Valley Federal to verify that the securities deposited complied with the terms of the contract between the McCurrys and Ted Dinges.

Even if Youngers did violate his duty as an escrow agent, this does not amount to a RICO violation. RICO applies only to those engaged in a pattern of racketeering. One violation of a limited duty is not a pattern. Moreover, it is not, on its own, evidence of a conspiracy to engage in a pattern of racketeering activity. Plaintiffs cannot expand one violation of a limited duty into a federal cause of action for treble damages merely by alleging a broad-based scheme which there is no evidence the defendant intended to join. In this case, the plaintiffs allege other conduct by Youngers, but as discussed above, those allegations either have no support or involve conduct which is not wrongful.

Because there is no evidence that Youngers joined any scheme to engage in a pattern of racketeering activity, the fact that Youngers used of the mails to conduct transactions for Valley Federal does not advance plaintiffs' RICO claims against Youngers. Plaintiffs do not allege that they were defrauded by the mailings.[5] They allege merely that the United States mails were used in support of the broader fraudulent schemes.

Finally, plaintiffs argue that summary judgment in favor of Youngers would be inappropriate because Youngers has not established as a matter of law that the other defendants in this case were not engaged in a pattern of racketeering activity. Aside from plaintiffs' apparent misapprehension of the standard for summary judgment, the court fails to understand why plaintiffs believe a RICO defendant, in order to obtain summary judgment, must prove not only that he did not violate the statute, but also that there was no racketeering activity committed by anyone. Defendant Youngers has demonstrated that there is no genuine dispute of material fact as to whether *he* engaged or conspired to engage in a pattern of racketeering activity. This entitles Youngers to summary judgment on the claims against him.

## B. Shaffer

■■■ Defendant Shaffer argues that there is no factual support for a RICO claim against him. Upon consideration of the briefs and the supporting exhibits, the court agrees. Plaintiffs here have not shown that there is a genuine issue as to whether Shaffer even knew about any of the alleged fraud against the plaintiffs, much less that Shaffer participated in such fraud.

Plaintiffs seek to impose liability on defendant Shaffer under 18 U.S.C. § 1962(b), which prohibits maintaining an interest in an enterprise through a pattern of racketeering activity, and 18 U.S.C. § 1962(c), which prohibits participating in the conduct of an enterprise through a pattern of racketeering

---

5. There is no evidence that the escrow agreement, by which the McCurry brothers were alleg-

edly defrauded, was mailed to them.

activity. Plaintiffs do not allege any acts of mail fraud committed by Shaffer himself. Therefore, plaintiffs rely on alleging that Shaffer directed some of the fraudulent mailings and, as a co-schemer with the other defendants, is liable for their predicate acts of racketeering.

The court will begin with background facts concerning defendant Shaffer. Fred Shaffer was a shareholder in Valley Federal. Shaffer and members of his family and close business associates held as much as 35.4% of Valley Federal stock. (At best, the 35.4% figure is based on extremely thin evidence, but the court will accept it for purposes of deciding Shaffer's motion.) Shaffer had acquired some of the stock from Gary Dinges, who then acted as a broker/agent arranging other sales of Valley Federal stock to Shaffer. Shaffer paid $12 per share even though the going rate for Valley Federal stock was in the neighborhood of $7.35. One seller, Lawrence Freund, used the proceeds of his sale to Shaffer to invest in Paganica.

Shaffer sought representation on the Valley Federal board of directors, and although the other directors apparently did not wish Shaffer to be a director, in 1978 the board was expanded to eight members so Shaffer could be a director. Shaffer then used his influence and voting power to place on the Board of Directors persons whom he wanted on the board—Bill Mitchell and Gerald Betts. Valley Federal directors were elected to staggered, three-year terms. Cumulative voting applied.

After several months on the board, Shaffer began to interject his opinions on matters the board was considering. Shaffer was an aggressive businessman who, according to some testimony, did not have the most pleasant disposition. Moreover, Shaffer was not familiar with banking law or banking practices. Consequently, Shaffer clashed with Valley Federal president, Ray Hall, and with Frank Hart, another director. Specifically, Hall had run the bank quite conservatively for a number of years, and Shaffer believed Valley Federal should make different types of loans and expand its investments. Shaffer sometimes suggested investments that would have violated federal banking laws.

In 1981 Hall was asked to resign and was replaced by Terry Glascock. Shaffer participated in the interviewing process and was in favor of hiring Glascock.

The Valley Federal board of directors had the authority to create an Executive Committee, consisting of the CEO and at least two board members. The Executive Committee had four members: Shaffer, Mitchell, Harold Dufek, and Hart. The Executive Committee had the power, with some exceptions, to exercise the full authority of the Board of Directors. A majority of the Committee (at least three members) constituted a quorum, and an official action by the Committee required a vote of the majority of quorum. Thus, the Executive Committee could act with the support of only two members. The Executive Committee was required to report its actions at regular board meetings.

Plaintiffs claim that Valley Federal's loans to Paganica, Rexmoor, and Galen Schrag were approved and directed by Shaffer. Plaintiffs claim further that Shaffer caused these loans with full knowledge of the fraud perpetrated against the plaintiffs. Therefore, according to plaintiffs, Shaffer joined the fraudulent scheme and is liable not only for his own acts, but also for the racketeering activity of his co-schemers. However, there is no evidence to support plaintiffs' claims against Shaffer, either on the basis of his own conduct or on the conduct of the other defendants.

Assuming the other defendants were involved in a scheme to defraud the various plaintiffs in this case, plaintiffs have presented no evidence that defendant Shaffer had any knowledge of the scheme or any fraudulent acts. Shaffer's affidavit contains specific denials of all alleged fraudulent schemes. Plaintiffs have no argument at all that Shaffer knew of the alleged scheme against plaintiffs Kaufman, Maloney, or the McCurry brothers, and plaintiffs only speculate that Shaffer knew about the alleged scheme to defraud plaintiffs Schwartz and Meiers and plaintiff Schrag. Clearly, speculation is not enough to defeat a summary judgment motion. Therefore, Shaffer cannot be liable for

any fraud committed by the other defendants in this case.

Moreover, there is no evidence that Shaffer himself conducted or directed any of the activity which caused plaintiffs' claimed damages. First, plaintiffs speculate that any action taken on behalf of Valley Federal was taken by or at the direction of Shaffer. This speculation is based in part on the erroneous assumption that Shaffer controlled Valley Federal's Board of Directors. Shaffer held a substantial portion of Valley Federal stock, as much as 35.4%. Although the system of cumulative voting and staggered elections gave Shaffer sufficient voting power to gain representation on the Valley Federal Board of Directors, he did not have. enough power to elect a majority of the board. Plaintiffs' assertion to the contrary results from some creative mathematics and a misapprehension of the concept of cumulative voting. Rather than giving plaintiffs a lesson in multiplication and percentages, the court will simply state that the majority shareholders within a voting class always have more voting power than a minority shareholder.

Furthermore, even if Shaffer did have sufficient voting power to elect a majority of the Board of Directors, the exercise of that power is not evidence of a RICO violation. Plaintiffs have made much of the fact that Shaffer used his voting power to elect directors of his choosing. This is neither unusual nor improper. Finally, plaintiffs' contention that Shaffer controlled other directors is not only unsupported, but is directly controverted by the affidavits and depositions of the other board members, all of whom state that Shaffer did not control, or even attempt to control, their votes. Shaffer did express his opinions at board meeting and vote in accordance with his opinions. Again, there is nothing unusual or improper about this conduct. Thus, plaintiffs attempt to attribute to Shaffer every action of the Board of Directors fails.

Second, plaintiffs speculate that every action taken by Brooks as an officer of Valley Federal was taken at Shaffer's direction. There is simply no evidence to support this assumption. Most of the actions had Board approval as reflected in the minutes. As to those actions that did not, there is no evidence that Shaffer directed them.

Third, there is no support for plaintiffs' "illegal meeting" theory, which holds that a $744,000 loan to Paganica and the $500,000 letter of credit to Ellinwood Bank arose out of an illegal meeting Shaffer conducted on January 5, 1982. Plaintiffs' support for this theory consists of (1) notes that state in total: "Olsen, Tom, Mitchell, Burt, Dufek. Special Meeting. 1–5–81. Paganica, Inc. A motion for us to turn down the loan by Burt Alumbaugh. Died for lack of a 2nd. Operations of Paganica, Inc., at its present level. Title to be start [sic] 60 days prior of," (punctuation added) and (2) Burt Alumbaugh's deposition testimony that he does not remember approving the letter of credit. There are several gaps between the evidence cited and the conclusions drawn therefrom: (1) the notes are dated 1981, not 1982; (2) the notes do not mention the letter of credit or the decision to loan money to Paganica; (3) the notes do not reflect Shaffer's presence. Plaintiffs respond that the meeting must have been held in 1982 because that is when the loan and letter of credit were issued. Plaintiffs then argue that based on the close proximity in time, the loan and letter of credit must have resulted from this meeting, although the notes do not reflect that. This is a classic circular argument. The illegal meeting theory involves other inconsistencies and leaps in logic, but because the record clearly does not support plaintiffs' conclusions, the court will not further lengthen this opinion by addressing them.

Fourth, there is nothing to indicate that Shaffer is responsible for the loan to plaintiff Schrag. Shaffer's affidavit states that he knew nothing of the loan to plaintiff Schrag before it was made. It is uncontroverted that the Schrag loan did not receive board approval. Due to the size of the loan, it did not require board approval. Plaintiffs imagine that Shaffer caused the loan simply because it happened at Valley Federal, but again, there is no evidence to support the link. Moreover, even if Shaffer knew of or even caused the loan, this would not evidence a RICO violation in the absence of any record evidence to suggest that Shaffer knew

Ted Dinges had fraudulently induced Schrag to borrow the money and invest it in Ag–Marketing.

Fifth, there is no evidence tying Dimensions Financial Corporation ("Dimensions") to the alleged fraudulent scheme. Dimensions arose out of the concept that banking laws allowed interstate ownership of financial institutions that offered NOW accounts because such financial institutions were not "banks" within the meaning of the federal banking laws. (Federal banking laws prohibited ownership by one entity of banks in more than one state without specific state statutory authorization. 12 U.S.C. § 1842(d)). After discussions among the Valley Federal Board of Directors, it was decided that Valley Federal's president, Terry Glascock, would pursue the legal viability of Dimensions, while Shaffer would take charge of seeking investment in the company, and Harold Dufek, another director, would take care of daily business at Valley Federal. At one time, directors and officers of Valley Federal held Dimensions stock, but they sold their shares to FII, Valley Federal's holding corporation, to avoid conflict of interest problems. The plan for dimensions was never realized because of changes in federal banking laws.

Plaintiffs argue that Shaffer pushed the Paganica loans because the loans could bring in up to $1.35 million to be used to fund Dimensions. However, plaintiffs present no evidence to support this argument. Defendant Shaffer has shown that the income from the Paganica loans would not be used to fund Dimensions. Funding Dimensions would require at least $50 million, with an initial investment of at least $12 million. Therefore, the Paganica loans would not have financed Dimensions. At any rate, there was no approval by the Valley Federal or FII Board of Directors to apply the proceeds of the Paganica loans to Dimensions. Finally, even if plaintiffs correctly assume that Shaffer intended to fund Dimensions in part with the Paganica loans, this is not relevant to plaintiffs' claims in light of the lack of evidence that Shaffer knew about the alleged fraud against the plaintiffs.

Sixth, the cited documents do not support the notion that Shaffer executed the alleged FII-loan-Dinges-kickback-Youngers-payoff scheme. Assuming some of the Paganica loan money was eventually paid to Dinges and Youngers, there is no evidence that Shaffer was aware of any such arrangement. At any rate, even if Shaffer had orchestrated payoffs to Dinges and Youngers, they did not cause plaintiffs' alleged damages and do not show that Shaffer was aware of any fraud these defendants may have committed.

Defendant Shaffer also seeks summary judgment as to Counts II, IV and V on the ground that those counts make no claim against him. Shaffer is not named as a defendant in Counts II, IV and V, and plaintiffs do not contend that Counts II, IV and V were intended to state a claim against defendant Shaffer. Moreover, in response to a motion for sanctions, which the court addresses below, plaintiffs have finally clarified the matter of which Counts are brought against which defendants. It is now clear that defendant Shaffer is named only in Count I, on which summary judgment has previously been granted, and Count III, on which the court now grants him summary judgment. Defendant Shaffer's excess of caution is understandable in light of plaintiffs' previous equivocations regarding the claims in Counts IV and V. However, the court will deny summary judgment as moot. For the sake of clarity the court reiterates the following: Count V has been dismissed by this court's Memorandum and Order of April 20, 1993; Count I has been dismissed by this court's Memorandum and Order of June 8, 1993; the defendants named in Count II are Gary Dinges, Youngers, Ewing, and Brooks; and only Ted Dinges and Gary Dinges are defendants to Count IV.

### IV. Statute of Limitations

 Although the court has ruled that defendants Youngers and Shaffer are entitled to summary judgment on other grounds, in the interest of narrowing the issues that will go to trial, the court will consider defendants' statute of limitations arguments as to Counts II and III. Upon consideration of the parties' arguments and the relevant law,

the court finds that plaintiffs are barred by the statute of limitations as to any claims that Youngers and Shaffer conducted the affairs of or acquired interests in Valley Federal and Paganica through a pattern of racketeering activity. Moreover, it appears that the same facts bar Counts II and III as to the other enterprises (Ag–Marketing Commodities and Dinges International) and defendants (Gary Dinges and Ted Dinges) involved.

The statute of limitations for a civil RICO action is four years. *Agency Holding Corp. v. Malley–Duff Associates*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). This action was filed on June 16, 1988. Therefore, the court must decide whether plaintiffs' RICO claims accrued before June 16, 1984.

The Supreme Court has not addressed the issue of when a RICO cause of action accrues. Every appellate court addressing the issue has applied some sort of discovery rule. *Granite Falls Bank v. Henrikson*, 924 F.2d 150, 153–54 (8th Cir.1991) (describing the various approaches among the circuits). The Tenth Circuit holds that a RICO claim accrues as soon as the plaintiff discovers or reasonably should have discovered all the elements of the cause of action: the existence and source of the injury; and that the injury was part of a pattern of racketeering. *Bath v. Bushkin, Gaims, Gaines, & Jonas*, 913 F.2d 817, 820 (10th Cir.1990) (quoting *Bivens Gardens Office Bldg. v. Barnett Bank*, 906 F.2d 1546, 1555 (11th Cir.1990), *cert denied*, —— U.S. ——, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991)). This rule applies separately to each alleged injury. *Id.* Therefore, a later injury does not restart the clock for a previous injury. *See Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir. 1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). Moreover, a subsequent predicate act of racketeering does not reset the clock when the plaintiff could have already discovered a pattern of racketeering. *Consumers Gas & Oil v. Farmland Indus., Inc.*, 815 F.Supp. 1403, 1412 (D.Colo.1992) ("Assuming a pattern occurred, a subsequent predicate act will not revive previous acts which plaintiff could

have discovered more than four year before the action was filed").

As stated above, a RICO claim accrues when the plaintiff discovered or should have discovered the elements of the cause of action. The question under the discovery rule is when the plaintiff had inquiry notice, that is notice of the possibility of fraud. Notice of a pattern of racketeering activity triggers the statute of limitations even if the notice does not reveal the entire scope of the scheme involved. *Harner v. Prudential Sec. Inc.*, 785 F.Supp. 626, 633 (E.D.Mich.1992).

Initially, plaintiffs argue that compliance with the statute of limitations is a jury question and thus inappropriate for the court to decide on a motion for summary judgment. The court agrees that when a cause of action accrued is a question of fact. *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir.1985). However, the court must again remind plaintiffs that the very purpose of summary judgment is to eliminate from a lawsuit those factual questions about which there is no genuine dispute. Fed.R.Civ.P. 56(c).

Defendants correctly note that plaintiffs' injuries all occurred months before June 16, 1984.

Plaintiff Kaufman claims he did not discover the mortgage on the development property until 1988. However, Kaufman had ample notice of his damages years before that. Within months of the March 1980 sales contract, Paganica failed to make the necessary monthly payments. In October 1982, Kaufman discovered that there was no escrow account as Dinges had promised there would be. Kaufman admits that he had begun to question Dinges' trustworthiness by that time. Kaufman knew by December 20, 1982, that Gary Dinges had failed to properly record the deeds from the December 17, 1982, transactions. Finally, the mortgage on the entire development property was filed with the Reno County Register of Deeds on February 16, 1984. Thus, it is clear that Kaufman should have discovered both his injury and the source thereof long before June 16, 1984.

Kaufman claims he was justified in believing Gary Dinges' misrepresentations to the bitter end because he considered Gary Dinges to be his attorney. Kaufman considered himself Dinges' client because Dinges is a licensed attorney, and because Dinges drafted the papers involved in their transactions. These facts alone are insufficient to create an attorney-client relationship. In fact, under the rules of ethics, "a lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure." D.R. 5–104(A). Therefore, Dinges could not have properly acted as Kaufman's counsel in these transactions. Even if Gary Dinges held himself out as Kaufman's attorney, Kaufman would have had to question Dinges' honesty eventually. Kaufman allegedly caught Gary Dinges in several lies, not the least of which was Dinges' promise to record the deed showing Kaufman's ownership in the development property. Nevertheless, Kaufman allegedly continued to rely upon Gary Dinges' representations. Kaufman is certainly correct that the public should not have to expect members of the bar to engage in fraud or any other unethical conduct. However, the ethical standards imposed on the legal profession do not eternally toll statute of limitations on fraud actions against attorneys.

Plaintiff Schrag was also aware of his damages and the source thereof more than four years before filing this action. By December 1982, Schrag had been promised by Ted Dinges that if he borrowed money for Ag–Marketing Commodities and for himself, Ag–Marketing Commodities would repay the entire loan. In April 1983 Ag–Marketing made the first quarterly payment due under the loan. In July 1983, Schrag received notice from Valley Federal that Ag–Marketing Commodities had failed to make the second quarterly payment. Ag–Marketing Commodities never made another payment on the Valley Federal loan, and Schrag was required to make the payments as they became due.

The McCurry brothers also had reason to discover the alleged fraud by Ted Dinges before June 16, 1984. The McCurrys invested their money in November 1982 on the promise that the investment could not lose and could only win. The McCurrys admit that the investment started to lose right away. The McCurrys received regular account statements and were thereby made aware that Ted Dinges had even traded their account below the agreed-upon stop loss amount. The investment was performing so badly that Ted Dinges returned $25,000 to the McCurrys in May 1983. Nevertheless, the McCurrys argue that they always believed they were covered until the fall of 1984 when Ted Dinges allegedly told the McCurrys that their investment was lost and the securities held in escrow to cover their losses were worthless. This creates a dispute as to when the McCurrys gained actual knowledge concerning the escrow account. However, there is no dispute that the McCurrys could have discovered that Ted Dinges had lied to them about the escrow account at any time after it was established. Moreover, the McCurrys had reason to suspect fraud as to the escrow agreement once they knew that Ted Dinges had made other misrepresentations regarding their MPA investment.

All the Count III plaintiffs were cautioned in writing that the investments were not guaranteed and could possibly lose money. The court recognizes that even without fraud, investments sometimes fail to meet up to the expectations of investors and brokers. Thus, the mere loss of an investment does not constitute notice of fraud. However, this court agrees with the court in *Harner*, which held that poor performance of an investment coupled with other "storm warnings" is sufficient notice of fraud to trigger the statute of limitations. *Harner*, 785 F.Supp. at 634, 639. The Count III plaintiffs here, like the plaintiffs in *Harner*, were told that their investments could not lose, but they also received written cautions to the contrary. *See id.* at 634. Thus, once plaintiffs' investments began to show poor performance, they had sufficient notice that fraud may have been involved.

Plaintiffs next argue that even if they should have discovered the fraud against each of them individually, they could not have discovered that their damages were the result of a *pattern* of racketeering activity. The plaintiffs apparently believe the statute of limitations is tolled until the entire scope of the scheme is expressly revealed to them. This is not the standard. First, the statute of limitations is triggered by notice, not by actual knowledge. Second, notice of a pattern of racketeering activity does not require notice of every detail of the scheme. In fact, there can be notice of injury and a pattern of racketeering activity before the scheme is even completed. *See Bivens Gardens*, 906 F.2d at 1554, *Consumers Gas & Oil*, 815 F.Supp. at 1412. Plaintiff Kaufman alleges that the conduct in Count II constitutes a pattern of racketeering. Clearly, Kaufman could have discovered the pattern with minimal diligence at least by the time Gary Dinges failed to record the deed showing Kaufman's interest in the development property. As for the Count III plaintiffs, the facts that should have alerted them to the possible fraud committed against each of them should have alerted them also to the possibility that Ted Dinges had made misrepresentations to other investors as well.

Finally, the plaintiffs argue that they did not have notice of the identities of all the participants in the alleged fraudulent schemes before June 16, 1984. Even if such notice is required, the court disagrees with plaintiffs' argument. By the time plaintiffs' injuries were apparent, they also had notice, if not actual knowledge, of the enterprises involved. The involvement of Youngers and Shaffer in the relevant enterprises was conspicuous. In fact, the identities of corporate directors is public information on file with the Secretary of State of Kansas. K.S.A. § 17-7503(a)(3). Although the plaintiffs never did discover sufficient evidence of involvement by defendants Youngers and Shaffer in RICO activity, all the relevant evidence presented to the court was discoverable by the defendants before June 16, 1984.

For the above reasons, the defendants are entitled to judgment as a matter of law on Counts II and III on statute of limitations

grounds. It appears that the same analysis would apply to the other defendants in this case. However, because those defendants did not move for summary judgment, the court will order the plaintiffs within thirty (30) days to show cause why the court's statute of limitations ruling should not apply with respect to the other defendants as well.

## VI. Local Rule 206(c)

Rule 206(c) of the United States District Court District of Kansas Rules of Civil Procedure provides in pertinent part:

> A memorandum in opposition to a motion for summary judgment shall begin with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, shall state the number of movant's fact that is disputed. All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party. The statements required by this subsection shall be in addition to the material otherwise required by these rules and the Federal Rules of Civil Procedure.

Plaintiffs insist that they have complied fully with the local rule. Specifically, plaintiffs assert that they have begun each memorandum opposing summary judgment with a "concise statement" of material facts in dispute as required by the first sentence quoted above. However, the plaintiffs statements of material facts, are by no definition "concise." They are rambling, repetitive, and comprise as many as ninety pages. Next, plaintiffs contend that they have controverted "every relevant fact" defendants alleged, thus avoiding those facts being deemed admitted as provided by the third sentence quoted above. Plaintiffs ignore that each fact not "*specifically* controverted" is deemed admitted. Vague and conclusory denials are insufficient under both the local rule and Federal Rule of Civil Procedure 56.

Moreover, plaintiffs do not even mention the second sentence in the quoted paragraph. Plaintiffs' Statements of Material Facts as to Which There Exists a Genuine Controversy fail to comply with several of these requirements. Plaintiffs failed with each allegation to "state the number of movant's fact that is disputed." Plaintiffs have, at various points, lumped numerous allegations into a single paragraph rather than placing each discrete fact into a separately numbered paragraph. Most importantly, plaintiffs often failed to cite with particularity the portions of the record on which they rely. For example, in plaintiffs' response brief opposing defendant Shaffer's motion for summary judgment, plaintiffs' support for their controverted fact number 102 is "Stmt. of Mat. Facts ¶¶ 1–102 and the authority there cited." Plaintiffs' counsel cannot possibly believe that is a particular citation to the record.

At best, plaintiffs' manner of compliance with Rule 206(c) is unorthodox. At worst, plaintiffs have not complied at all, and the court could consider all of the defendants' statements of fact admitted. However, the court has chosen not to do so. In fact, the court would not even address the matter of Rule 206(c) if there were any indication that counsel's misapprehension of the local rule has been alleviated. However, in light of Plaintiffs' Response in Opposition to Defendant Mark Youngers' Objection to Plaintiffs' Response in Opposition to Defendant Shaffer's Motion for Summary Judgment, it is clear the misunderstanding continues.

The court suspects, as do the defendants, that plaintiffs' responses in this case were designed to confuse and complicate the issues to the point that the court would simply deny summary judgment in order to avoid the arduous task of sorting the smoke and mirrors from the substance. If this was plaintiffs' plan, it has been unsuccessful. Although the court has not decided these mo-

tions on the basis of plaintiffs' failure to comply with Rule 206(c), neither has the court based its decision on those of plaintiffs' "facts" which are immaterial,[6] mere argument,[7] or unsupported by the record.[8] To do so would unfairly prejudice the defendants in this case.

Furthermore, to the extent that plaintiffs' response to defendant Shaffer's motion for summary judgment makes additional allegations against defendant Youngers, the court has not considered those allegations in deciding Youngers' motion for summary judgment. There is no apparent dispute about this matter.

## VII. Motion for Sanctions

By its Memorandum and Order of April 20, 1993, this court granted summary judgment to defendants Denis Dieker and Bonaventure Kreutzer on Count IV of plaintiffs' Third Amended Complaint and dismissed Count V for lack of subject matter jurisdiction. *Schrag v. Dinges*, 820 F.Supp. 565 (D.Kan. 1993). These two defendants, who are not named in any other count, now move for sanctions.

A summary of the relevant procedural history of this case is in order. Plaintiffs filed their Third Amended Complaint, which added Counts IV and V, on April 11, 1990. (Doc. 353). Count IV is a RICO claim, as described above, and Count V was a state law fraud claim against defendants Dieker and Kreutzer based on the same facts as alleged in Count IV. Defendants Dieker and Kreutzer filed for dismissal of Count V on August 27, 1990, arguing that there was no pendent party jurisdiction under RICO and citing the relevant authority. (Doc. 633).

Plaintiffs responded to the motion to dismiss on October 2, 1990. (Doc. 464). Plaintiffs argued therein that this court did have jurisdiction to hear Count V, even asserting that the motion to dismiss was frivolous.

---

6. For example, plaintiffs' assertion that one of the defendants was "selfish, self-centered and very aggressive" is not material to whether that defendant committed a RICO violation. Likewise, the court has not considered plaintiffs' pages of historical information about Valley Federal.

7. As a rule of thumb, "Hogwash! " is not a statement of fact and would more properly be placed in the argument section of a brief.

8. Of particular concern to the court in this regard are plaintiffs' misrepresentations of deposition testimony.

Although the plaintiffs used the words "pendent party jurisdiction" in their response, the supporting case law plaintiffs cited, notably the Supreme Court decision in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), dealt with pendent *claim* jurisdiction. Plaintiffs ignored *Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), which was the Supreme Court's pronouncement regarding pendent party jurisdiction and which expressly limited *Gibbs* to pendent claim jurisdiction.[9] Plaintiffs failed to cite any RICO case involving pendent party jurisdiction. Plaintiffs also included the following language in their response brief:

> There are only two plaintiffs and three defendants involved in Count IV of the Third Amended Complaint. The plaintiffs are Nickelson and his wife's probate estate and the defendants are Gary Dinges ("Dinges"), Dieker and Kreutzer. These are the same named parties to in Count V.

Finally, plaintiffs mischaracterized the defendants' statement of the law regarding pendent party jurisdiction.

This court denied the motion to dismiss. *Schrag v. Dinges*, 788 F.Supp. 1543 (D.Kan. 1992). The court held that it had pendent claim jurisdiction because defendants Dieker and Kreutzer were parties to both Count IV and Count V. *Id.* at 1549. The court cited *Gibbs* and other pendent claim jurisdiction case law. *Id.*

In the meantime, discovery was proceeding on the case. On September 30, 1990, plaintiffs answered defendants' requests for admissions. Plaintiffs denied the following requests:

> 7. Do you admit that Paragraphs 256 through 296 and Count IV of the Third Amended Complaint filed herein state no claim against defendant Denis Dieker (Bonaventure Kreutzer)?

> 8. Do you admit that defendant Denis Dieker (Bonaventure Kreutzer) did not cause any of the damage claimed by you in Count IV of the Third Amended Petition?

On November 6 and 8, 1991, defendants filed for partial summary judgment on Count IV, the RICO claim. (Doc's 597 & 599). Defendants presented several arguments in support. Plaintiffs responded to the motion for partial summary judgment on January 13, 1992. (Doc. 663). Plaintiffs claimed they did not understand why the motion was filed since they had never included Dieker and Kreutzer as defendants in Count IV. Defendants then refiled for dismissal of Count V. The court granted the motions for dismissal and partial summary judgment. *Schrag*, 820 F.Supp. 565.

As defendants note, there are several sanctions provisions in the Federal Rules of Civil Procedure and the United States Code that may apply in this case. However, the court will consider only Federal Rule of Civil Procedure 11. Rule 11 states in part:

> The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney fee.

The court uses an objective reasonableness test to determine whether a Rule 11 violation has occurred. *White v. General Motors Corp.*, 908 F.2d 675, 680 (10th Cir.1990), *cert. denied*, 498 U.S. 1069,

---

9. Congress passed a supplemental jurisdiction statute which overruled *Finley*. Public Law No. 101–650, § 310 (1990) (codified at 28 U.S.C. § 1367). However, that statute does not apply to cases which, like this one, were filed before December 1, 1990. Pub.L. No. 101–650, § 310(c).

111 S.Ct. 788, 112 L.Ed.2d 850 (1991); *Adamson v. Bowen*, 855 F.2d 668, 673 (10th Cir.1988). A good faith belief in the merit of a claim or argument is not enough; nor is it enough that a colorable claim could have been made if one is not actually made. *White*, 908 F.2d at 680. The court has discretion in determining the factual issues and whether the claim or argument is warranted by law. *Dodd Ins. Serv's, Inc. v. Royal Ins. Co. of America*, 935 F.2d 1152, 1155 (10th Cir.1991). However, once it is determined that a Rule 11 violation has occurred, the imposition of sanctions is mandatory. *Lawton v. Medevac Mid–America, Inc.*, 138 F.R.D. 586 (D.Kan.1991) (citing *Adamson*, 855 F.2d at 672). The sanction must be the minimum amount necessary to deter future violations. *White v. General Motors Corp.*, 977 F.2d 499, 502 (10th Cir.1992).

Plaintiffs argue that they did not intentionally mislead the court or the defendants. The best that can be said is that plaintiffs' counsel drafted the relevant documents in a confusing manner and failed to cite relevant Supreme Court precedent that was contrary to plaintiffs' position. The worst is that plaintiffs intentionally misled the court and the defendants as a stalling tactic, knowing that the claims against Dieker and Kreutzer eventually would be dismissed. *See Brandt v. Schal Associates, Inc.*, 960 F.2d 640 (7th Cir.1992) (counsel's "antagonistic, windy, excessive and voluminous style" supports conclusion that object was to impede resolution of the case). The court's five-year experience with this case supports either conclusion. Either way, the result was the same—unnecessary hardship on the defendants and the court. Had plaintiffs and their counsel been candid and/or competent, defendants Dieker and Kreutzer would have been dismissed from this lawsuit much earlier, and the court would have been spared the time and resources it has taken to resolve this matter. Even if plaintiffs were not trying to "harass or cause unnecessary day," plaintiffs' opposition to the motion to dismiss was clearly not warranted by existing law or a good faith argument for reversal of existing law. Plaintiffs simply ignored the applicable Supreme Court precedent. *See Teamsters Local No. 579 v. B & M Transit, Inc.*, 882 F.2d 274, 280 (7th Cir.1989) ("A party is not entitled to deliberately ignore or misstate case law that is unfavorable to its position."); *Borowski v. DePuy, Inc.*, 850 F.2d 297, 305 (7th Cir.1988) (upholding sanction for counsel's "ostrich-like" tactic of pretending contrary authority does not exist).

Plaintiffs cannot seriously argue that they did not know about the *Finley* case given that defendants had cited it in support of their motion to dismiss. Of course, even if plaintiffs did not know about the *Finley* decision and its impact on pendent party jurisdiction, this is only because counsel did not conduct a reasonable inquiry, as Rule 11 requires.

Plaintiffs further argue that the defendants are to blame for any confusion because they did not take reasonable measures to clarify the issue. The court disagrees. The defendants moved to dismiss Count V in a timely manner. Plaintiffs' response to that motion only further confused the issue and convinced the defendants, as well as the court, that Dieker and Kreutzer were defendants to state and federal law claims, thus giving the court jurisdiction over the state law claim. Furthermore, defendants submitted requests for admissions as to Count IV, which the plaintiffs denied. Plaintiffs argue that the defendants actually requested plaintiffs to admit that their Count V fraud claim had no basis. Although the court believes this is based on a twisted reading of the requests, the court will give plaintiffs the benefit of the doubt and will not impose sanctions under Rule 37(c) for failure to admit a matter which is later proved true. The defendants took reasonable steps to ascertain the allegations against them, but these steps obviously did not help. Plaintiffs suggest a phone call to plaintiffs' counsel would have yielded better results. However, there is no reason to believe that counsel would have responded to such a phone call any more carefully or candidly than he has responded to the motions in this case.

Finally, plaintiffs argue that defendants are not entitled to recover their expenses because even if they had known they were not Count IV defendants, they would have

undergone roughly the same expense in defending Count V. Plaintiffs continue to ignore that pendent party jurisdiction was unavailable under RICO at the time the Third Amended Complaint was filed. Therefore, had the plaintiffs clearly stated that defendants Dieker and Kreutzer were named only in Count V, that Count would have been dismissed for lack of subject matter jurisdiction much earlier.

For the foregoing reasons, the court grants defendants Dieker and Kreutzer's motion for sanctions. The conduct of plaintiffs' counsel has been particularly egregious in this case.[10] A reasonable sanction in this case includes costs, expenses and attorney fees incurred by defendants Dieker and Kreutzer as a result of plaintiffs' failure to admit and misleading drafting of plaintiffs' response brief to the motion to dismiss. *Brandt,* 960 F.2d at 647 (cost to other side is reasonably accurate measure of harm done by Rule 11 violation). Moreover, a severe sanction is warranted in this case because the previous sanction order obviously failed to deter counsel.

Rule 11 provides for sanctions against counsel and represented parties. However, to justify sanctioning a party there must be specific findings that the party was aware of the wrongdoing. *White,* 908 F.2d at 685. Moreover, when the sanction involves the failure to adequately research the law or counsel's style of practice, it is appropriate to sanction only counsel. *Borowski,* 850 F.2d 297. There is no indication in this case that plaintiffs authorized counsel's use of confusing and misleading arguments or that they knew counsel was relying on inapplicable law. Therefore, the court finds it appropriate in this case to impose the sanction upon counsel only.

As the defendants request, the court will allow thirty (30) days for the parties to reach an agreement regarding the amount of expenses, costs and attorney fees incurred. If no agreement on these matters is reached and reported to the court within that time, the court will set an evidentiary hearing to determine the appropriate sanction award.

## VIII. Motion to Substitute Brief

Plaintiffs' have filed a Motion for Leave to Substitute Plaintiffs' Response in Opposition to Defendant Shaffer's Motion for Summary Judgment with a Corrected Original. (Doc. 783). Plaintiffs' counsel argues, in a nutshell, that at the time he was drafting his response brief, he was attending to serious personal matters, which distracted him from using proper spelling and grammar. Plaintiffs assure the court that the "corrected original" contains no substantive changes and is intended only to benefit the court's reading of the brief.

Motions of this type are routinely granted. Here, however, the court will deny the motion because the court had already been laboring with the briefs for some time before the motion was filed. Assuming plaintiffs correctly state that the changes are not substantive, using the corrected brief would not benefit the plaintiffs. The court assures the plaintiffs that counsel's grammatical errors have not prejudiced them.

## IX. Show Cause Order

This court, by its Memorandum and Order of June 8, 1993, gave the plaintiffs thirty days to show cause why the order should not apply as to all defendants, including those that had not filed for summary judgment. *Schrag v. Dinges,* 825 F.Supp. 954 (D.Kan. 1993). That Memorandum and Order granted the motions for summary judgment as to Count I on the ground that the plaintiffs to Count I were not the real parties in interest. Thirty days have elapsed, and plaintiffs have not responded to the show cause order. Therefore, it is appropriate for the court at this time to dismiss Count I altogether on the ground that plaintiffs Schwartz and Meiers are not the real parties in interest.

---

10. In fact, this court has already sanctioned plaintiffs' counsel once in this case. That involved plaintiffs' attempt to gain discovery from a named defendant who was a defunct corporation and thus not a proper defendant to the lawsuit. Plaintiffs argued at that time that it could not have learned that the corporation was defunct except by suing it and seeking discovery. This argument was obviously frivolous because the necessary information was public information on file with the Kansas Secretary of State.

IT IS BY THIS COURT THEREFORE **ORDERED** that Youngers' motion for summary judgment (Doc. 679) is hereby granted.

**IT IS FURTHER ORDERED** that defendant Shaffer's motion for summary judgment (Doc. 774) is hereby granted.

**IT IS FURTHER ORDERED** that plaintiffs have thirty (30) days in which to show cause why the court's rulings regarding the statute of limitations should not apply as to the other defendants in this case.

**IT IS FURTHER ORDERED** that the plaintiffs' motion for leave to substitute an amended brief (Doc. 783) is hereby denied.

**IT IS FURTHER ORDERED** that the motion for sanctions filed by defendants Dieker and Kreutzer (Doc. 793) is hereby granted. The court hereby grants the parties thirty (30) days to resolve the issue of the amount of sanctions to be awarded.

**IT IS FURTHER ORDERED** that Count I of the Third Amended Complaint is hereby dismissed.