73 F.3d 374
 RICO Bus.Disp.Guide 8919
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Galen SCHRAG; Merlin Kaufman; Michael Maloney; Dale
Mccurry; A.J. Mccurry; Robert Mccurry; Odel
Mccurry; Cecil Mccurry; James Meier;
William G. Schwartz,
Plaintiffs-Appellants,
John R. NICKELSON, individually, and in his capacity as
Administrator of the Estate of Neola Nickelson, Plaintiff,
James Craig DODD, Esq., Appellant,
v.
Ted DINGES, Jr.; Gary Dinges; Mark Youngers; Charles
Brooks; Jay Ewing; Robert "Bob" Simpson; Bonaventure A.
Kreutzer, Jr.; Denis Dieker; Valley Federal Savings & Loan
Association; Paganica, Inc.; Dinges International, Inc.;
Ag-Marketing Commodities, Inc.; Financial Investments,
Inc., Defendants-Appellees,
and
Fred SCHAFFER, Defendant.
Galen SCHRAG, Merlin Kaufman; Michael Maloney; Dale
Mccurry; A.J. Mccurry; Robert Mccurry; Odel
Mccurry; Cecil Mccurry; James Meier;
William G. Schwartz,
Plaintiffs-Appellees,
John R. NICKELSON, individually, and in his capacity as
Administrator of the Estate of Neola Nickelson, Plaintiff,
v.
Ted DINGES, Jr.; Gary Dinges; Charles Brooks; Jay Ewing;
FredF Shaffer; Robert "Bob" Simpson; Bonaventure A.
Kreutzer, Jr.; Denis Dieker; Valley Federal Savings & Loan
Association; Paganica, Inc.; Dinges International, Inc.;
AG-Marketing Commodities, Inc.; Financial Investments,
Inc., Defendants,
and
Mark YOUNGERS, Defendant-Appellant.
Galen SCHRAG; Merlin Kaufman; Michael Maloney; Dale
Mccurry; A.J. Mccurry; Robert Mccurry; Odel
Mccurry; Cecil Mccurry; James Meier;
William G. Schwartz,
Plaintiffs-Appellees,
John R. NICKELSON, individually, and in his capacity as
Administrator of the Estate of Neola Nickelson, Plaintiff,
v.
Ted DINGES, Jr.; Gary Dinges; Mark Youngers; Charles
Brooks; Jay Ewing; Fred Shaffer; Bonaventure A. Kreutzer,
Jr; Denis Dieker; Valley Federal Savings & Loan
Association; Paganica, Inc.; Dinges International, Inc.;
AG-Marketing Commodities, Inc.; Financial Investments,
Inc., Defendants,
and
Robert "Bob" SIMPSON, aka Bob Simpson, Defendant-Appellant.
 Nos. 94-3005, 94-3093, 94-3102.
 United States Court of Appeals, Tenth Circuit.
 Nov. 14, 1995.
 
 Before MOORE, BARRETT, and WEIS,* Circuit Judges.
 ORDER AND JUDGMENTJ[1]
 MOORE, Circuit Judge.
 
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of these appeals. See Fed. R.App. P. 34(a); 10th Cir. R. 34.1.9. The cases are therefore ordered submitted without oral argument.
 
 
 2
 These three appeals arise out of the same action brought pursuant to the Racketeering and Corrupt Organizations Act (RICO), 18 U.S.C.1961-1968. In No. 94-3005, plaintiffs appeal the district court's order of June 8, 1993, granting summary judgment to defendants Youngers, Shaffer, and Simpson on Count I of the third amended complaint and ordering plaintiffs to show cause why summary judgment should not be granted to the remaining defendants on Count I. See Schrag v. Dinges, 825 F.Supp. 954, 959 (D.Kan.1993). Plaintiffs also appeal the court's order of August 13, 1993, dismissing Count I of the third amended complaint, granting summary judgment to defendants Youngers and Shaffer on Counts II and III, and giving plaintiffs thirty days to show cause why Counts II and III should not be dismissed as to all defendants on statute of limitations grounds, see Schrag v. Dinges, 150 F.R.D. 664, 684 (D.Kan.1993). In addition, plaintiffs appeal the court's order of December 14, 1993, to the extent it granted summary judgment to the nonmoving defendants on Counts II and III based on the statute of limitations. Finally, plaintiffs' counsel appeals the district court's award of sanctions against him in the August 13 order. See id.
 
 
 3
 In No. 94-3093, defendant Youngers appeals the district court's order of March 1, 1994, denying his motion for Rule 11 sanctions against plaintiffs and their counsel. In No. 94-3102, defendant Simpson also appeals the district court's March 1 order, which denied his motion for Rule 11 sanctions, as well. See Schrag v. Dinges, 153 F.R.D. 665, 667 (D.Kan.1994).[2]
 
 No. 94-3005
 
 4
 The facts of the district court action are set forth in detail in the district court's opinions, and we will refer only to those that are relevant to our disposition of the present appeals. Plaintiffs' third amended complaint, which was 105 pages long, was comprised of four RICO counts and one count based on state law. Each of the RICO counts alleged a separate fraudulent scheme perpetuated by a different combination of the defendants against one or more of the plaintiffs. All of the allegedly fraudulent schemes were perpetuated for the purpose of creating and obtaining an interest in a real estate investment company, Rexmoor Properties, Inc., the stock of which would be publicly traded. The effort to take Rexmoor public ultimately failed, and in February 1984, Rexmoor withdrew its registration statement from the SEC.
 
 Count I
 
 5
 Count I detailed what plaintiffs called the "Paganica Supper Club Scheme." Defendant Gary Dinges was president of, and a principal shareholder in, a real estate development company called Paganica, which owned a country club and golf course within a large residential development known as Pinnacle Park. Through a contract with the owners of the development, Paganica was responsible for managing and developing the surrounding residential lots. Within the country club complex was a supper club that was leased to S & M, Inc., a corporation in which plaintiffs Schwartz and Meier were two of the three shareholders.
 
 
 6
 The third amended complaint alleged that, by early 1981, Paganica was in serious financial trouble and defendants Gary Dinges and Jay Ewing, another Paganica shareholder, devised a plan to retire Paganica's debt and make a profit, as well. They decided to start a new company (Rexmoor), refinance Paganica's debt, transfer Paganica's assets to the new company, and retire the newly refinanced debt of Paganica through the sale of stock issued in the new company.
 
 
 7
 In the meantime, to keep Paganica afloat, the country club and golf course complex had to continue to operate. On April 1, 1981, Paganica, S & M, its three shareholders, and several individual guarantors who were Paganica shareholders, entered into a three-year management agreement. Pursuant to the management agreement, S & M was to take over the operation of the entire country club complex and golf course. The agreement provided that Paganica would acquire twenty percent of the stock of S & M, that S & M would have an option to purchase the complex and golf course for $1 million and that, in the event S & M failed to exercise its option to purchase the property, the individual shareholders could sell their remaining shares in S & M to Paganica or the guarantors for the sum of $400,000. The management agreement also contained the following provision, upon which Count I of the complaint is based: "It is agreed that the parties hereto shall not cause additional mortgages or encumbrances to be executed nor filed against any of the property described herein." App. to Br. of Appellants (No. 94-3005), Vol. III, Ex. N at 8. Gary Dinges executed the agreement both as the president of Paganica and as an individual guarantor. Plaintiffs allege that Ewing also personally guaranteed the agreement, although his signature does not appear on the original agreement in the record. See id. at 13.
 
 
 8
 Just two weeks after the management agreement was executed, Gary Dinges submitted a loan request in excess of $1 million to defendant Valley Federal Savings & Loan Association on behalf of Paganica. When Valley Federal's board voted against making the loan, Gary Dinges had to find another way to secure financing that would not require the board's approval. In November 1981, such a loan was arranged for Paganica, allegedly through the efforts of the following defendants: Gary Dinges; Ewing; Fred Shaffer, who was a major shareholder in Valley Federal; Mark Youngers, who was the chief financial officer for Valley Federal and a director of, and shareholder in, Paganica; Charles Brooks, who was the chief loan officer for Valley Federal; and Robert Simpson, who was the president of Peoples State Bank of Ellinwood, Kansas (Ellinwood Bank). Each of these defendants allegedly either had or acquired through the transactions at issue an ownership interest in Rexmoor and, therefore, each allegedly had an incentive to assist Paganica in its efforts to restructure its debt and transfer its assets to Rexmoor.
 
 
 9
 As a result of these defendants' alleged negotiations, in January 1982, Ellinwood Bank loaned Paganica $500,000 secured by a letter of credit issued by Valley Federal. In February, Valley Federal loaned Paganica $360,000, and in April, it loaned Paganica an additional $1,085,000. A portion of the proceeds from the latter loan was used to fund the letter of credit Valley Federal had issued to Ellinwood Bank. Both of the Valley Federal loans to Paganica were secured with mortgages encumbering the property that was subject to S & M's option under the management agreement. Sometime in 1984, Gary Dinges informed Schwartz and Meier about the mortgages.
 
 
 10
 In June 1988, plaintiffs Schwartz and Meier brought the present RICO claim against defendants Gary Dinges, Ewing, Shaffer, Youngers, Brooks, and Simpson, alleging they had either maintained an interest and control in, or participated in the conduct of affairs of, an enterprise through a pattern of racketeering, in violation of 18 U.S.C.1962(b),(c). Plaintiffs' theory was that Gary Dinges and Ewing never intended to keep the promise in the management agreement that the property subject to S & M's option would not be further encumbered. They contended that the other named defendants, all of whom allegedly knew about the option and the promise not to encumber the property, ignored these provisions and assisted Gary Dinges and Ewing in encumbering the property because they stood to reap enormous personal gain if Rexmoor were successful.
 
 
 11
 In Count I of the third amended complaint, plaintiffs Schwartz and Meier did not mention the existence of S & M. Rather, they purported to be the owners of the option to purchase under the management agreement, as well as the owners of those assets of the Paganica Supper Club and the golf and country club that were not real property. They alleged, therefore, that defendants' racketeering activity injured them because they "lost their investment and the assets owned by them that comprised the Paganica Golf and Country Club and lost the opportunity to purchase the property subject to their option." App. to Br. of Appellants (No. 94-3005), Vol. I at 45, p 153.
 
 
 12
 During the course of discovery, plaintiffs Schwartz and Meier admitted that the option to purchase belonged to S & M, not to them, personally, and their own documents reflected that S & M, not Schwartz and Meier individually, owned the assets of the supper club and country club. After discovery was completed, defendants Youngers, Shaffer, and Simpson each moved for summary judgment, asserting, among other things, that plaintiffs Schwartz and Meier had no standing to bring the claim asserted in Count I because that claim legally belonged to S & M, not to Schwartz and Meier. The undisputed evidence showed that Schwartz and Meier had sold their entire interest in S & M in the fall of 1984, and that S & M no longer existed as a corporation at the time this action was begun.
 
 
 13
 In their response to Youngers' summary judgment motion, plaintiffs conceded that, generally, shareholders cannot sue directly for an injury to the corporation. See, e.g., McDaniel v. Painter, 418 F.2d 545, 547 (10th Cir.1969). Plaintiffs argued, however, that because they were parties to the management agreement as individuals and because the promise not to encumber the property subject to S & M's option was made by and between all the parties, defendants Gary Dinges and Ewing owed them a special duty as individuals not to breach that promise. Therefore, plaintiffs contended, they could bring the present action for alleged RICO violations in their own right. The district court rejected plaintiffs' position, Schrag, 825 F.Supp. at 957-58, as do we.
 
 
 14
 Plaintiffs are correct that there is a widely recognized exception to the rule that a shareholder cannot bring a nonderivitive action for injuries sustained by the corporation, which states that a shareholder can bring a direct action for a violation of a duty that was owed directly to the shareholder as an individual. See, e.g., Crocker v. FDIC, 826 F.2d 347, 349 (5th Cir.1987), cert. denied, 485 U.S. 905 (1988). Plaintiffs' claim falls on another hurdle, however.
 
 
 15
 The private right of action granted by RICO provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C.1964(c). Based on this language, the Supreme Court has held that a plaintiff who asserts a violation of 18 U.S.C.1962 "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).
 
 
 16
 The injuries plaintiffs alleged in the complaint, however, were to property that actually belonged to S & M, namely, the option and the assets of the supper club, country club and golf course. In their response to summary judgment, plaintiffs asserted yet another injury.
 
 
 17
 Schwartz and Meier are contending in their lawsuit that they have been damaged to the extent Paganica actually received and Valley Federal actually paid money pursuant to the mortgage that was filed on the property subject to the option. In terms of monetary damages, Schwartz and Meier contend that they have been damaged to the extent as of the difference between the encumbrance on the property that existed on April 1, 1981, plus the $1,000,000 purchase price and the actual fair market value of the property itself.
 
 
 18
 App. to Br. of Appellants (No. 94-3005), Vol. IV, Ex. FFF at 1-2. Similarly, the pretrial conference order entered in January 1993 reflected that plaintiffs based their damages claim on the value of the property subject to S & M's option. See App. to Br. of Appellants (No. 94-3005), Vol. VI at 29-32. Because plaintiffs had no interest in either the option to purchase or the property itself, however, they cannot claim an injury "in their business or property" based on the value of the property subject to the option. Therefore, the district court properly concluded that plaintiffs Schwartz and Meier could not bring the RICO claim asserted in Count I of the third amended complaint.
 
 Counts II and III
 
 19
 Count II of the third amended complaint was brought by Merlin Kaufmann, who, with his partner, owned all of the property in Pinnacle Park except for the country club and golf course area that belonged to Paganica and the individual residential lots that were already sold. Kaufman alleged that in September 1982, defendants Youngers, Brooks and Shaffer assisted defendants Gary Dinges and Ewing in obtaining for Paganica and Rexmoor a $3.2 million loan from First National Bank & Trust Co. of Oklahoma City that was secured by property belonging to Kaufman, all without Kaufman's knowledge or approval. As a result, property of Kaufman's that had previously been free and clear of any encumbrances became heavily mortgaged.
 
 
 20
 Count III of the third amended complaint concerned three allegedly fraudulent schemes involving Ted Dinges (Gary's brother) and Ag-Marketing Commodities, Inc., a commodity investment company owned by Ted Dinges. In the first scheme, Ted Dinges convinced plaintiff Galen Schrag to borrow substantial sums of money from Valley Federal and loan a portion of them to Ag-Marketing and to Dinges, International, a company owned by Gary and Ted Dinges. Schrag alleged that Ted Dinges assured him that Ag-Marketing would make all the quarterly payments on the loans from Valley Federal and that Brooks, with whom Schrag met to execute the loan papers, confirmed this fact. Based on these representations, Schrag borrowed $360,000 from Valley Federal in December 1982, $156,00 of which went to himself and the remainder of which went to Ag-Marketing and Dinges International. He borrowed an additional $10,000 from Valley Federal in February 1983, all of which went to Dinges International.
 
 
 21
 Ag-Marketing made the first payment on the loans, but failed to make any others. Schrag had to make the other payments and, when he was unable to make the payments, he ultimately lost the property he had pledged as collateral for the loans, including farmland, equipment, and crops. Schrag alleged that, although defendants Youngers and Shaffer knew that Ted Dinges and Ag-Marketing were in a precarious financial situation and that Schrag was borrowing more money than he could possibly repay on his own, they did nothing to prevent the loans from going through.
 
 
 22
 In the second scheme, Ted Dinges convinced plaintiff Michael Maloney to invest $15,000 in a Managed Partnership Account (MPA) with Ag-Marketing in January 1983. In making the investment, Maloney allegedly relied on Dinges' representation that he had a formula that virtually guaranteed success in commodities investments. Ted Dinges, however, did not have a successful strategy, other than to churn the accounts and earn large commissions for himself, while depleting the value of the MPAs. Maloney ultimately lost his entire investment.
 
 
 23
 The third scheme alleged in Count III was similar to the second scheme, except that the victims were five brothers, plaintiffs Dale, A.J., Robert, Odel, and Cecil McCurry. Ted Dinges convinced the McCurry brothers to invest $15,000 each in MPAs and guaranteed them that they would not lose their investment. To back up this guarantee, he promised to place marketable securities in escrow sufficient to cover losses between their investment amount of $75,000 and the stop loss amount of $50,000. Based on these representations, the McCurry brothers invested the $75,000 in November 1982. The securities, which consisted of 4,000 shares of Rexmoor stock, were given to Valley Federal to be held in escrow. Defendant Youngers executed a document acknowledging receipt of the securities on behalf of Valley Federal and conveyed it to the McCurry brothers in December. In May 1983, the MPAs were performing so poorly that Ted Dinges returned $25,000 to the McCurry brothers. Due to his churning activities, however, the McCurry brothers lost their remaining investment. Because Rexmoor ultimately failed to go public, the 4,000 shares of Rexmoor that were held in escrow to cover the McCurrys' losses proved worthless.
 
 
 24
 Both Shaffer and Youngers moved for summary judgment on Counts II and III of the third amended complaint. The district court granted summary judgment to each of them, after concluding that there was no evidence to support any of plaintiffs' allegations of racketeering activity with respect to these two defendants. Schrag, 150 F.R.D. at 671-76. The court then went on to address another ground for relief that both defendants had raised: the statute of limitations. The court concluded that all plaintiffs' claims in Counts II and III were barred by the statute of limitations. Id. at 677-79; Br. of Appellants (No. 94-3005), Ex. C at 3.
 
 
 25
 The statute of limitations for RICO actions is four years. Agency Holding Corp. v. Malley-Duff & Assocs., 483 U.S. 143, 156 (1987). We have held that a cause of action under RICO accrues " 'as soon as the plaintiff discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern.' " Bath v. Bushkin, Gaims, Gaines & Jonas, 913 F.2d 817, 820 (10th Cir.1990)(quoting Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Fla., Inc., 906 F.2d 1546, 1554-55 (11th Cir.1990), cert. denied, 500 U.S. 910 (1991)), overruled in part on other grounds by Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350 (1991). The district court carefully considered the claims of each of the plaintiffs involved in Counts II and III of the third amended complaint and, with respect to each, concluded that he should have discovered his injury, its source, and that it was a part of a pattern, more than four years before the original complaint was filed in June 1988. Schrag, 150 F.R.D. at 677-79.
 
 
 26
 Plaintiffs devote only one paragraph of their fifty-page appellate brief to the issue of the statute of limitations and advance only one argument: the district court erroneously ignored their affidavits and/or deposition testimony that "they did not know, or even suspect, that Ewing, Youngers, Brooks, and Shaffer were associated in anyway [sic] with G. Dinges as co-schemers in defrauding them."[3] Br. of Appellants (No. 94-3005) at 46. Whether plaintiffs actually knew the identity of all the people involved in the allegedly fraudulent schemes is not the relevant inquiry, however.
 
 
 27
 Rather, the pertinent question is whether plaintiffs should have known the existence and source of their injury and that it was part of a pattern more than four years before the complaint was filed. Because plaintiffs do not challenge the district court's findings and conclusions on this issue, we affirm the district court's disposition of Counts II and III on statute of limitations grounds. See Hein v. Techamerica Group, Inc., 17 F.3d 1278, 1279 (10th Cir.1994)(holding that when a district court's findings are not expressly challenged on appeal, we will accept them as undisputed).
 
 Counts IV and v. and Rule 11 Sanctions
 
 28
 Counts IV and V of the complaint were based upon a fraudulent scheme allegedly perpetrated against John Nickelson and his wife Neola Nickelson, who is now deceased. Count IV, which made allegations against defendants Gary Dinges, Ted Dinges, Bonaventure Kreutzer, Jr., and Denis Dieker, was intended to plead a RICO claim. Count V of the third amended complaint alleged only a state law fraud claim against Kreutzer and Dieker. Counts IV and V were first added to this suit through the third amended complaint, which was filed in April 1990.
 
 
 29
 In August 1990, Kreutzer and Dieker moved to dismiss Count V, arguing that the court could not assert pendent party jurisdiction[4] over them and citing pertinent authority in support, including Aldinger v. Howard, 427 U.S. 1 (1976), and Finley v. United States, 490 U.S. 545 (1989). Plaintiffs objected to the motion to dismiss in October, contending that the motion was "frivolous." App. to Br. of Appellants (No. 94-3005), Vol. IX, Ex. I at 1.[5]
 
 
 30
 Relying on United Mine Workers v. Gibbs, 383 U.S. 715 (1966), a case involving the exercise of pendent claim, not pendent party, jurisdiction,[6] plaintiffs argued that "Federal Courts permit plaintiffs to bring in pendent party defendants under state law claims when there is a 'common nucleus of operative facts' between the facts that give rise to the federal question controversy and the facts that give rise to the pendent claims." App. to Br. of Appellants (No. 94-3005), Vol. IX, Ex. I at 1-2. Plaintiffs continued:
 
 
 31
 Here, there is an exact mirrored identity between the facts which give rise to the federal question controversy (Count IV) and the facts that give rise to the pendent claims (Count V).
 
 
 32
 There are only two plaintiffs and three defendants involved in Count IV of the Third Amended Complaint. The plaintiffs are Nickelson and his wife's probate estate and the defendants are Gary Dinges, ("Dinges"), Dieker and Kreutzer. These are the same named parties to in [sic] Count V.
 
 
 33
 All of the operative facts and hence operative allegations that are necessary to state the pendent claims set forth in Count V were in fact stated in the federal claim in Count IV. Count V merely incorporated by reference the factual allegations set forth in Count IV.
 
 
 34
 Id. at 2. Plaintiffs' argument ignored Aldinger and Finley, both of which held that the Gibbs analysis does not apply to pendent party jurisdiction. Aldinger, 427 U.S. at 14-16; Finley, 490 U.S. at 549-50.
 
 
 35
 Based on plaintiffs' statement that Dieker and Kreutzer were defendants in both Count IV and Count V, the district court denied the motion to dismiss Count V. The court concluded that, because the state and federal claims shared a common nucleus of operative facts, the court could exercise pendent claim jurisdiction over the state claim pursuant to Gibbs. Schrag v. Dinges, 788 F.Supp. 1543, 1549 (D.Kan.1992).
 
 
 36
 Kreutzer's and Dieker's motions for partial summary judgment on the RICO claim were pending before the district court at the time it denied the motion to dismiss. Plaintiffs responded to the summary judgment motions a week later. In their response, plaintiffs admitted that Count IV did not state a RICO claim against either Dieker or Kreutzer, explaining as follows:
 
 
 37
 The only reason that Dieker and Kreutzer are mentioned in Count IV is because they are alleged to have participated in the fraud as co-schemers. The only Count in which they are named as party defendants is Count V. Nickelson makes no effort in the Third Amended Complaint to contend that either Dieker or Kreutzer were engaged in a pattern of racketeering activity or conducting a RICO enterprise.
 
 
 38
 App. to Br. of Appellees (Nos. 94-3093 & 94-3102), Vol. II at 33 (emphasis added).
 
 
 39
 In light of plaintiffs' statement that Kreutzer and Dieker were not intended to be parties to the federal claim in Count IV, the two defendants reurged their motion to dismiss Count V for lack of jurisdiction. The district court ultimately entered summary judgment in favor of Dieker and Kreutzer on Count IV and granted the motion to dismiss Count V.[7] The court reasoned that once plaintiffs admitted they did not intend to assert a federal claim against Dieker and Kreutzer, the court could not assert pendent claim jurisdiction over Count V. Schrag v. Dinges, 820 F.Supp. 565, 567-68 (D.Kan.1993). The only basis for jurisdiction would be pendent party jurisdiction, which was not available under the rationale of Finley.[8] Id.
 
 
 40
 After the district court granted the relief they sought, Dieker and Kreutzer moved for sanctions against plaintiffs' counsel. They argued that because of plaintiffs' responses to defendants' requests for admissions[9] and plaintiffs' statements in their brief in response to the motion to dismiss, defendants were kept in the case longer than they should have been and were forced to incur unnecessary expense in defending against the allegations of plaintiffs' lengthy complaint. Defendants sought sanctions pursuant to a number of authorities, but the district court decided to award them only on the basis of Fed.R.Civ.P. 11. See Schrag, 150 F.R.D. at 681.
 
 
 41
 We apply an abuse of discretion standard in reviewing all aspects of the district court's decision.[10] Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990); McHenry v. Utah Valley Hosp., 927 F.2d 1125, 1126 (10th Cir.) ("We apply an abuse of discretion standard to both the violation determination and the imposition of sanctions under Fed.R.Civ.P. 11."), cert. denied, 502 U.S. 894 (1991). Rule 11 imposes an affirmative duty on an attorney "to inquire into the facts and law before filing a pleading. His inquiry must be reasonable under the circumstances." Coffey v. Healthtrust, Inc., 1 F.3d 1101, 1104 (10th Cir.1993). An attorney's signature on a pleading signifies that he has made a reasonable inquiry into the facts and the law, and that the pleading is "well grounded in fact, warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and ... not interposed for any improper purpose." Id.
 
 
 42
 The district court determined that regardless of whether plaintiffs' counsel intentionally misled the court, or only drafted documents in a confusing manner and failed to cite relevant Supreme Court precedent contrary to plaintiffs' position, "plaintiffs' opposition to the motion to dismiss was clearly not warranted by existing law or a good faith argument for reversal of existing law." Schrag, 150 F.R.D. at 682. The court also found that the response to the motion to dismiss resulted in "unnecessary hardship on the defendants and the court." Id. The court, therefore, imposed sanctions against plaintiffs' counsel. Id. at 683-64.
 
 
 43
 On appeal, plaintiffs' counsel does not contest the amount of the sanctions, only the imposition of sanctions. Counsel argues that defendants' motion for sanctions was a "sham," Br. of Appellants (No. 94-3005) at 48, and that the argument advanced by defendants in support of their motion was and is "concocted fiction," id. at 47. Specifically, counsel contends that on numerous occasions in 1990-93, he assured counsel for defendants Dieker and Kreutzer that his clients did not intend to advance a RICO claim against these defendants. Further, counsel contends that, "aside from one clumsy sentence, it is absolutely and irrefutably clear from the plain language in every response ever filed by Appellants' counsel in opposition to Dieker and Kreutzer's motions to dismiss, that the only argument advanced was that the court should exercise pendent party jurisdiction over them."[11] Id. at 49.
 
 
 44
 Turning first to counsel's argument that he repeatedly told defendants' counsel that he did not intend to name their clients in a RICO claim, we remind counsel that Rule 11 does not concern what an attorney may have told opposing counsel to be the truth, but what the attorney represented as the truth in a document that he signed and filed with the court. See, e.g., Griffen v. City of Okla. City, 3 F.3d 336, 339 (10th Cir.1993)("[S]anctions are only appropriate if a pleading, motion, or paper is signed in contravention of the Rule."). As to counsel's characterization of the response he filed in the district court, we note that the district court obviously did not find it "absolutely and irrefutably clear" that counsel was arguing that the court had jurisdiction over the state law claims against Dieker and Kreutzer based solely on pendent party jurisdiction, not pendent claim jurisdiction. Nor does our own reading of the portion of the response provided in the record reveal such clarity. Moreover, even if counsel's argument was based solely on pendent party jurisdiction, Rule 11 sanctions would still be appropriate, because counsel completely ignored controlling Supreme Court precedent that was contrary to his position. See Szabo Food Serv., Inc. v. Canteen Corp., 823 F.2d 1073, 1081-82 (7th Cir.1987), cert. dismissed, 485 U.S. 901 (1988).
 
 
 45
 As the district court explained, "[h]ad plaintiffs and their counsel been candid and/or competent, defendants Dieker and Kreutzer would have been dismissed from this lawsuit much earlier, and the court would have been spared the time and resources it has taken to resolve this matter." Schrag, 150 F.R.D. at 682. We conclude the district court did not abuse its discretion in awarding sanctions against plaintiffs' counsel pursuant to Rule 11.
 
 Nos. 94-3093 & 94-3102
 
 46
 In these two appeals, defendants Youngers and Simpson, respectively, challenge the district court's denial of their motions for Rule 11 sanctions. Because the two motions rested on some common grounds and the district court disposed of them in a single order, we will consider these appeals together.
 
 
 47
 Youngers filed his sanctions motion after the district court disposed of the claims in Count I of the third amended complaint and entered summary judgment in his favor on Counts II and III. Youngers contended that the allegations against him were not well grounded in either fact or law. In support of his argument that counsel failed to make a reasonable inquiry into the factual basis for the allegations against Youngers before filing the third amended complaint, Youngers provided the court with a partial transcript of a deposition he gave plaintiffs' counsel in June 1988, before the original suit was filed, as well as a copy of the corrections he made to the deposition when he signed it in September 1988.
 
 
 48
 Youngers argued that Counts I through III of the third amended complaint were not "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law," Fed.R.Civ.P. 11 (1993), because (1) Schwartz and Meier had no standing to sue for the encumbrance of the property subject to the option to purchase, (2) all the claims were clearly barred by the statute of limitations, and (3) no RICO liability could arise from Youngers' alleged failure to prevent the Valley Federal loan to Schrag from going through. In addition, Youngers raised five challenges to the factual allegations of Counts I through III of the third amended complaint and argued that plaintiffs' counsel failed to make a reasonable inquiry into the facts before filing the complaint.
 
 
 49
 First, Youngers noted that Count I of the complaint alleged that Schwartz and Meier personally held the option to purchase under the management agreement and that they were personally injured when the property subject to the option was encumbered in violation of the management agreement. The statement that Schwartz and Meier owned the option was, undeniably, false; the management agreement clearly showed that the option belonged only to S & M, Inc. Further, Youngers argued, the uncontroverted evidence showed that Schwartz and Meier had divested themselves of any interest in S & M long before the suit was ever filed.
 
 
 50
 Second, Youngers stated that before the suit was filed, he told plaintiffs' counsel that he was not involved in making the loans from Valley Federal to Paganica at issue in Count I, and that he did not approve the loans as a director of Paganica. The corrections to the deposition that Youngers signed in September 1988, long before the third amended complaint was filed, also stated that Youngers was not even employed at Valley Federal at the time either of the loan commitments were made. Nonetheless, Schwartz and Meier filed a RICO claim against Youngers, alleging that he had participated in securing the loans to Paganica in his capacity as an officer of Valley Federal and that he had voted to approve the loans in his capacity as a director of Paganica.
 
 
 51
 Third, Youngers maintained that he told plaintiffs' counsel before suit was filed that he was not involved, either as an officer of Valley Federal or as a member of the Paganica board, in securing the loans from First National Bank of Oklahoma City to Paganica at issue in Count II of the third amended complaint. In addition, Youngers argued, plaintiffs' counsel stipulated at Kaufman's deposition that Kaufman had no personal knowledge of any evidence connecting Youngers to the loan or the mortgages. Nonetheless, Kaufman brought a RICO claim against Youngers alleging that he had participated in obtaining the loan that resulted in the filing of mortgages on Kaufman's property.
 
 
 52
 Fourth, Youngers stated that he told plaintiffs' counsel before the third amended complaint was filed that he did not participate in making the loan from Valley Federal to Schrag at issue in Count III and that he was not even aware of the loan until after it was made. Further, Schrag testified at his own deposition that he was not aware of any evidence connecting Youngers with the loan. Nonetheless, Schrag attempted to hold Youngers liable for allegedly permitting the loan to go through in order to protect his own investments in Ag-Marketing, even though Youngers knew that Ag-Marketing was in financial trouble and that Schrag did not have the ability to repay the loan himself.
 
 
 53
 Finally, Youngers contended that the McCurry brothers' RICO claim against him was not well grounded in fact because, contrary to their allegation, there was no evidence that the escrow receipt Youngers signed was sent to them through the mail. The lack of a mailing also undermined the legal basis for their claim, because without the mailing, there would be no predicate act of racketeering to support RICO liability. See App. to Appellants' Br. (No. 94-3005), Vol. I at 84, p 246 (alleging that Youngers committed mail fraud); 18 U.S.C.1961(1) (including mail fraud in the definition of "racketeering activity").
 
 
 54
 Simpson also filed his sanctions motion after the court disposed of plaintiffs' claims in Counts I, II, and III. He contended that Rule 11 sanctions were warranted against plaintiffs and/or their counsel for two reasons. First, he argued that the claim against him in Count I of the complaint was not well grounded in fact because it alleged that he knew about the option to purchase in the management agreement but that he ignored it because he stood to reap enormous personal gain. Simpson pointed out that both Schwartz and Meier acknowledged in their depositions that they had no personal knowledge of any facts supporting the allegation that Simpson knew about the option. Further, in response to his motion for summary judgment, plaintiffs were not able to produce any evidence that Simpson knew about the option or knowingly participated in a fraudulent scheme against them.
 
 
 55
 Second, Simpson argued that there was neither a factual nor a legal basis for Schwartz and Meier's allegation in Count I that they were given the option to purchase. The management agreement on its face showed that the option was given solely to S & M, and there was no legal basis upon which plaintiffs could argue that they, too, had a direct interest in the option.
 
 
 56
 In ruling on the motions for sanctions, the district court correctly noted that it should "use[ ] an objective reasonableness test to determine whether a Rule 11 violation has occurred," and that "once it is determined that a Rule 11 violation has occurred, the imposition of sanctions is mandatory." Schrag, 153 F.R.D. at 666. The district court then denied the sanctions motions, reasoning as follows:
 
 
 57
 [A]lthough most of the plaintiffs' claims did not survive summary judgment, the court finds that the bringing of those claims was objectively reasonable. Furthermore, plaintiffs' opposition to the motions for summary judgment was objectively reasonable in light of the legal arguments plaintiffs made.... [P]laintiffs' arguments on such issues as real party in interest and statute of limitations were not frivolous. The court simply found that plaintiffs' position was incorrect....
 
 
 58
 Rule 11 also provides for sanctions when a pleading or other paper is not "well grounded in fact." Although many of plaintiffs' factual allegations had insufficient support in the record to survive summary judgment, this alone is not sanctionable. Nor is plaintiffs' lack of compliance with Local Rule 206(c) in formulating their statements of fact in response to the motions for summary judgment.
 
 
 59
 Id. at 667 (footnote omitted).
 
 
 60
 As we noted earlier, we apply an abuse of discretion standard when reviewing all aspects of the district court's ruling on the sanctions motions. Cooter & Gell, 496 U.S. at 405. "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Id.
 
 
 61
 The district court's decision does not address whether plaintiffs' counsel conducted a reasonable investigation or acted reasonably upon the results of that investigation before filing the third amended complaint. Instead, the district court appears to have rejected defendants' arguments about the factual basis of the third amended complaint based solely on the court's conclusion that the failure of plaintiffs' factual allegations to have sufficient support in the record to survive summary judgment "alone is not sanctionable." Schrag, 153 F.R.D. at 667.
 
 
 62
 If the court did not even consider whether counsel conducted a reasonable inquiry and whether he acted reasonably in light of his inquiry, then the district court's ruling was based on erroneous view of the law. If, on the other hand, the district court did consider the evidence concerning counsel's investigation before he filed the third amended complaint, but determined that counsel's conduct was reasonable under the circumstances, then the court based its ruling on an erroneous assessment of the evidence. Based on the evidence before the court, it would be an abuse of discretion to find that plaintiffs' Oklahoma counsel[12] did not commit a Rule 11 violation when he filed the third amended complaint. Therefore, we must reverse the district court's denial of Rule 11 sanctions and remand the action for further proceedings.
 
 
 63
 Under Rule 11, counsel's signature on the third amended complaint constituted a " 'certificate' " by him that "to the best of [his] 'knowledge, information, and belief formed after reasonable inquiry' the [third] amended complaint is well grounded in fact." Burkhart ex rel. Meeks v. Kinsley Bank, 852 F.2d 512, 514 (10th Cir.1988)(quoting Fed.R.Civ.P. 11). Rule 11 requires not only that an attorney make a reasonable investigation into the facts before filing a complaint, Coffey, 1 F.3d at 1104; White v. General Motors Corp., 908 F.2d 675, 681 (10th Cir.1990), cert. denied, 498 U.S. 1069 (1991), but that he act reasonably given the results of his investigation, White, 908 F.2d at 682; Navarro-Ayala v. Nunez, 968 F.2d 1421, 1426 (1st Cir.1992); Collins v. Walden, 834 F.2d 961, 965-66 (11th Cir.1987). In this case, plaintiffs' counsel committed several Rule 11 violations when he signed the third amended complaint.
 
 
 64
 First, the third amended complaint omitted any reference to S & M, Inc. in Count I and, instead, substituted plaintiffs Schwartz and Meier for the corporation. For instance, the complaint alleged that "[o]n April 1, 1981, a contract was executed between Paganica and Schwartz and Meier whereby Schwartz and Meier were given an option to purchase the country club building and the golf course acreage for $1,000,000." App. to Br. of Appellants (No. 94-3005), Vol. I at 13, p 57. The complaint also alleged that Schwartz and Meier, rather than S & M, owned the Paganica Golf and Supper Club and all the furniture, equipment, and inventory associated with the pro shop and the country club. Id. at 14, p 59. These are only two of the numerous allegations that should have referred to S & M, but instead referred only to Schwartz and Meier.
 
 
 65
 All of these factual allegations were "demonstrably incorrect." Navarro-Ayala, 968 F.2d at 1425. The management agreement, on which the entire first count is based, clearly reflects that S & M, alone, owned the option to purchase. Further, documents produced by Schwartz and Meier themselves showed that S & M, not the individuals, owned the assets of the supper club, country club, and golf course referred to in the complaint. See App. to Appellants' Br. (No. 94-3005), Vol. III, Ex. O.
 
 
 66
 Because Count I of the third amended complaint was based on the management agreement, any reasonable investigation of the facts supporting that count would, necessarily, require an examination of the management agreement. Cf. Teamsters Local No. 579 v. B & M Transit, Inc., 882 F.2d 274, 280 (7th Cir.1989)("Rule 11 requires at a minimum that a party read the document whose terms it is contesting...."). Therefore, counsel's signature on the third amended complaint, which contained allegations that even a cursory reading of the management agreement would show to be false, reflects one of two things: either counsel failed to read the management agreement (and thereby failed to conduct a reasonable investigation), or counsel read the agreement and signed the pleading anyway, knowing that it contained false allegations (and thereby failed to act reasonably in light of his investigation).
 
 
 67
 Which of these two actions counsel actually took, we do not know. Counsel made no attempt, by affidavit or otherwise, to explain the nature of his investigation or to show that he acted reasonably based on that investigation when he signed the third amended complaint. Either act, however, is a violation of Rule 11. See, e.g., White, 908 F.2d at 681, 682; Villar v. Crowley Maritime Corp., 990 F.2d 1489, 1500 (5th Cir.1993)(holding that counsel's reliance on a falsehood that should have been discovered in the exercise of reasonable care and diligence warranted imposition of sanctions under Rule 11), cert. denied, 114 S.Ct. 690 (1994). Likewise, the ownership of the assets of the supper club, country club, and golf course should have been ascertained by plaintiffs' counsel in the course of any reasonable investigation, and his failure to discover the truth, or to plead the truth once discovered, violated Rule 11.
 
 
 68
 On appeal, plaintiffs' counsel does not dispute that Count I of the third amended complaint contained factual allegations that he knew or should have known were false. Instead, he argues only that, because defendants also had a copy of the management agreement and his clients acknowledged in their June 1991 depositions that the option belonged only to S & M, his own conduct does not warrant the imposition of sanctions. Essentially, counsel is arguing "no harm, no foul."
 
 
 69
 Once again, counsel fails to understand the central thrust of Rule 11, which is directed at representations of fact and law that an attorney makes in documents filed with the court. Even if opposing counsel knows the truth, an attorney cannot sign and file a document with the court that contains false statements of fact of which the attorney knew or should have known, without being subject to Rule 11 sanctions. The extent of the harm caused by counsel's conduct has no bearing on whether counsel's conduct violated Rule 11 in the first instance. Rather, the extent of the harm is relevant to the determination of the amount of sanctions that should be imposed for the Rule 11 violation. Cf. White, 908 F.2d at 683 (noting that one of the purposes of Rule 11 sanctions is to "compensat[e] victims of litigation abuse"). We conclude the district court abused its discretion when it failed to find that plaintiff's counsel violated Rule 11 by signing a pleading that he knew or should have known contained false statements of fact about his client's rights and interests.
 
 
 70
 The evidence before the district court also demonstrated conclusively that counsel violated Rule 11 when he signed the complaint that contained allegations against Youngers that counsel had previously been told were false. The record shows that plaintiffs' counsel deposed Youngers before he filed the initial complaint in June 1988. What counsel learned as a result of that deposition, and the corrections to the deposition that Youngers signed in September 1988, was that Youngers was not involved in making any of the loans at issue in the third amended complaint or in obtaining or approving those loans on behalf of Paganica. In fact, Youngers testified that he was not even aware of either the loan to Paganica from First National Bank at issue in Count II, or the loan from Valley Federal to Schrag at issue in Count III, until after the loans were made.
 
 
 71
 In response to Youngers' motion for sanctions, plaintiffs' counsel chose not to submit an affidavit explaining what investigation he made of the facts before filing suit.[13] The present record does not reflect that counsel made any further investigation of the facts related to him by Youngers before he filed the initial complaint. The record does reflect that after he filed the initial complaint, counsel made some further investigation before he filed the third amended complaint. Specifically, the record contains excerpts from various depositions that plaintiffs' counsel participated in after litigation began, but before he filed the third amended complaint.[14] These deposition excerpts, however, do not contradict the relevant statements that Youngers made to plaintiffs' counsel in his initial deposition. Moreover, after discovery was completed, the district court concluded that plaintiffs had failed to produce any competent evidence establishing Youngers' involvement, either from the lending side or from the borrowing side, in the loans at issue in Counts I, II, and III of the third amended complaint. See Schrag, 150 F.R.D. at 671-72.
 
 
 72
 We agree with the district court that "sanctions are not appropriate in every case in which summary judgment is granted," Schrag, 153 F.R.D. at 667, and that the failure of a plaintiff's factual allegations to find sufficient support in the record to survive summary judgment is not, in and of itself, sanctionable, id. This case, however, involves more than the mere failure of plaintiffs' allegations to survive summary judgment. Counsel was specifically told, before he initially filed suit and before he signed the third amended complaint, that the material facts upon which plaintiffs' claims against Youngers were based were false.
 
 
 73
 Rule 11 requires that an attorney act reasonably based on the information he learns from a prefiling investigation into the facts. See White, 908 F.2d at 682; Navarro-Ayala, 968 F.2d at 1426. If, after inquiry, the facts do not support the claims, counsel should not sign the complaint. Collins, 834 F.2d at 965-66. If he does so, he violates Rule 11. Id. at 966.
 
 
 74
 Counsel's inability, even after five years of litigation, to produce any concrete evidence[15] contrary to Youngers' statements in 1988 that he was not involved with the loans at issue, demonstrates that counsel "failed to act reasonably given the results of [his] inquiries," White, 908 F.2d at 682, when he signed the third amended complaint. Under the circumstances, the district court abused its discretion in failing to find that plaintiffs' counsel violated Rule 11 when he signed the third amended complaint containing factual allegations about defendant Youngers that counsel's prefiling investigation had shown to be false.
 
 
 75
 The district court's decision does not address Simpson's arguments that the allegations against him in Count I of the third amended complaint were not well grounded in fact and were not a product of reasonable inquiry. We have previously held that,
 
 
 76
 [w]hen faced with a serious Rule 11 motion, ... a district court must make findings or give an explanation for its denial of the motion. Such findings or explanations must be 'detailed enough to assist in appellate review, help assure the litigants that the decision was the product of thoughtful deliberation, and enhance the deterrent effect of the ruling.'
 
 
 77
 Griffen, 3 F.3d at 340 (quoting White, 908 F.2d at 681) (citations omitted). Simpson's arguments appear colorable, and it is not obvious from the record why Rule 11 sanctions would not be warranted. See id. We note that it is quite possible that the district court did not even consider Simpson's arguments, because the record before us is completely silent about what investigation, if any, counsel conducted into the facts supporting the allegations against Simpson in Count I, and, in its original disposition of Count I, the district court did not reach the issue of whether there was a factual basis for plaintiffs' claim against Simpson. Under the circumstances, we must remand this matter to the district court for further findings and a further development of the record, if necessary. See id.
 
 Conclusion
 
 78
 In No. 94-3005, we conclude that the district court properly entered judgment against all plaintiffs on Counts I, II, and III of the third amended complaint. We further conclude that the court properly assessed Rule 11 sanctions against plaintiffs' Oklahoma counsel in connection with the claims against defendants Kreutzer and Dieker in Counts IV and V.
 
 
 79
 In Nos. 94-3039 and 3102, we conclude that the district court abused its discretion in denying the motions for Rule 11 sanctions filed by defendants Youngers and Simpson in two respects. The court erred in failing to find that plaintiffs' Oklahoma counsel violated Rule 11 by signing the third amended complaint, which (1) contained factual allegations about his clients' rights and interests in Count I that counsel knew or should have known were false and (2) contained factual allegations against defendant Youngers that counsel's prefiling investigation had shown to be false. On remand, the district court should determine the amount of sanctions to be awarded for these Rule 11 violations. The district court did not make sufficient findings about the factual basis for plaintiffs' claim against Simpson or about counsel's prefiling inquiry, if any, for us to review the district court's decision not to grant Simpson's motion for sanctions on this issue. On remand, the district court should develop the record further, if necessary, and make the necessary findings to support its decision.
 
 
 80
 The judgment of the United States District Court for the District of Kansas is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this order and judgment.
 
 
 
 *
 Honorable Joseph F. Weis, Jr., Senior Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 We initially identified a potential jurisdictional problem with appeal Nos. 94-3093 and 94-3102 and asked the parties to submit briefs on the jurisdictional issue. Having reviewed the parties' briefs and the materials they submitted in support, we conclude that we have jurisdiction to hear these appeals
 
 
 [3]
 In support of their argument, plaintiffs state in conclusory fashion that "the relevant documentary evidence overwhelmingly established that it was reasonable to conclude that there was no reason for the Plaintiffs/Appellants to suspect that a banker from Ellinwood, Kansas, or a member of the Valley Federal Board of Directors or a loan officer at the local savings and loan was involved in a fraudulent scheme with G. Dinges." Br. of Appellants (No. 94-3005) at 46-47. Plaintiffs then give a citation to numerous exhibits in the record. We remind counsel that this is not proper appellate argument, as it is neither our duty to construct legal arguments for the litigants, see Drake v. City of Ft. Collins, 927 F.2d 1156, 1159 (10th Cir.1991), nor our duty to review the evidence and determine how it might support such an argument
 Further, even if plaintiffs did not suspect that certain of the defendants were involved with Gary Dinges as "co-schemers," we fail to see how this affects the application of the statute of limitations to the claims in Count III, as they involved Ted, rather than Gary, Dinges.
 
 
 [4]
 Pendent party jurisdiction is "jurisdiction over parties not named in any claim that is independently cognizable by the federal court." Finley v. United States, 490 U.S. 545, 549 (1989)(footnote omitted)
 
 
 [5]
 Our review of this matter has been greatly hindered by plaintiffs' failure to tell us where, in their ten volumes of appendices filed in appeal No. 94-3005, alone, we might find a copy of their response to the motion to dismiss that is at issue. Once we eventually located a copy of the response, we discovered that plaintiffs had failed to provide us with a copy of the entire document and had included only the first three pages of the response in their appendix
 
 
 [6]
 Pendent claim jurisdiction is "jurisdiction over nonfederal claims between parties litigating other matters properly before the court." Finley, 490 U.S. at 548
 
 
 [7]
 Plaintiffs later settled their claim against the remaining defendant(s) in Count IV, and the district court entered final judgment in the case in March 1994
 
 
 [8]
 In December 1990, Congress abrogated the holding in Finley by enacting 28 U.S.C. 1367(a), which gives a district court supplemental jurisdiction over "all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," even if those other claims involve the joinder or intervention of additional parties. Section 1367 applies only to actions commenced on or after December 1, 1990, however, so it did not affect the district court's exercise of jurisdiction in this case
 
 
 [9]
 In August 1990, plaintiffs had denied each of the following requests for admission by Dieker, as well as identical requests made by Kreutzer: "Do you admit that Paragraphs 256 through 296 and Count IV of the Third Amended Complaint filed herein state no claim against Denis Dieker [Bonaventure A. Kreutzer, Jr.]?" "Do you admit that defendant Denis Dieker [Bonaventure A. Kreutzer, Jr.] did not cause any of the damage claimed by you in Count IV of the Third Amended Petition?" App. to Br. of Appellees (No. 94-3005), Doc. 6, Exs. A & B
 
 
 [10]
 We note that at the time the district court ruled on defendants' motion for sanctions, the 1993 amendments to Rule 11 were not yet in effect. Therefore, the imposition of sanctions was mandatory once the district court found a Rule 11 violation had occurred. See Griffen v. City of Okla. City, 3 F.3d 336, 342 (10th Cir.1993)("Rule 11 requires the district court to impose sanctions if a document is signed in violation of the Rule....")
 
 
 [11]
 In addition to these two arguments, on page forty-nine of his brief, counsel attempts to incorporate by reference his response to the sanctions motion that he filed in the district court. The fifty-page limit of Fed. R.App. P. 28(g) cannot be circumvented by incorporating by reference a brief filed in the district court. See, e.g., Executive Leasing Corp. v. Banco Popular, 48 F.3d 66, 67-68 (1st Cir.), cert. denied, 64 U.S.L.W. 3206 (U.S. Oct. 2, 1995); Conkling v. Turner, 18 F.3d 1285, 1299 n. 14 (5th Cir.1994); Fleming v. County of Kane, 855 F.2d 496, 498 (7th Cir.1988)
 
 
 [12]
 Both Youngers and Simpson initially sought sanctions against plaintiffs, their Oklahoma counsel, and their local counsel. Both defendants subsequently withdrew the requests for sanctions against local counsel. The record before us does not show what part any of the plaintiffs may have played in the violations of Rule 11 that we will discuss. Therefore, we address only the Rule 11 violations committed by plaintiffs' Oklahoma counsel, James Craig Dodd, and leave a determination of the plaintiffs' individual culpability to the district court on remand. See White v. General Motors Corp., 908 F.2d 675, 685 (10th Cir.1990)("[T]he sanctioning of a party requires specific findings that the party was aware of the wrongdoing."), cert. denied, 498 U.S. 1069 (1991)
 
 
 [13]
 In response to Youngers' contention that plaintiffs' counsel failed to conduct a reasonable inquiry or to act reasonably upon the inquiry he did conduct, plaintiffs' counsel merely argued that the district court's order of August 13, 1993, granting summary judgment to Youngers was wrong. See App. to Br. of Appellant Mark Youngers (No. 94-3093) at 110
 
 
 [14]
 Although the record also contains a variety of other documents, it does not reveal which documents, if any, plaintiffs' counsel discovered before he filed the third amended complaint
 
 
 [15]
 Plaintiffs contend that they produced "overwhelming evidence of Youngers' involvement in the alleged fraudulent schemes," Br. of Appellees (Nos. 94-3093 & 94-3102) at 4. The district court concluded, however, that much of this "evidence" was either speculation and conjecture or a misrepresentation of the evidence. Schrag, 150 F.R.D. at 671-72. Based upon our review of plaintiffs' appellate briefs and the record, we agree with the district court's characterization of plaintiffs' "evidence."